**Susan NUGENT, Individually and as Next Friend of William Scott Nugent and Ray Nugent, Appellants,**

v.

**PILGRIM'S PRIDE CORPORATION and Patrick Pilgrim, Appellees.**

No. 06–99–00084–CV.

Court of Appeals of Texas, Texarkana.

Submitted April 20, 2000.

Decided Oct. 2, 2000.

Rehearing Overruled Nov. 7, 2000.

David C. Carlile, D. Scott Carlile, The Carlile Law Firm, Marshall, Sharon Jevert Hemphill, Houston, for appellants.

Levi G. McCathern, II, McCathern Mooty Buffington, LLP, Dallas, C. Brett Stecklein, McCathern Wadlington Mooty, LLP, Dallas, Lori M. Cliffe, Law Offices of Lori M. Cliffe, San Antonio, for appellees.

Before GRANT, ROSS, and BASS, JJ.

## OPINION

Opinion by Justice BILL BASS, Sitting by Assignment.

This is an appeal from a summary judgment granted in favor of Pilgrim's Pride Corporation and Patrick Pilgrim ("Defendants or Appellees"). Susan and Ray Nugent's suit alleged trespass and temporary damage to their farm by Defendants' negligent or grossly negligent dumping of noxious and toxic chemicals and chicken waste on the adjoining farm. Rainfall and accompanying erosion carried the waste and chemicals onto the Nugent farm. The Nugents also claim that Defendants' use of the adjoining property, together with their operation of a feed mill approximately a mile away, constitutes a nuisance depriving them of the use and enjoyment of their property. The Nugents also claim that the Defendants' operation of the feed mill and the adjoining farm has caused them personal injuries. The petition also included claims for ultra-hazardous activity, assault, destruction of natural resources, and remediation. We reverse the summary judgment on the claims for temporary damage to land, personal injury, trespass, and nuisance.

Susan Nugent owns a 103–acre farm near Pittsburg in Camp County. She inherited the property in 1988, although she and her husband had operated the farm as part of a larger ranching operation since at least 1984. Pilgrim's Pride operates an adjoining farm known as the Carpenter Place. A creek flows from the Carpenter Place onto the Nugent property. Defendants disposed of large amounts of chicken litter and hatchery waste on this farm. Defendants made heavy applications of this material on a steep hillside just above the creek and close by the Nugent property. Defendants tilled the hillside up and down the hill, a practice the Nugents claim contributed to the erosion of the hillside

when torrential rains fell in May of 1991. As a result of the heavy rain, silt and chicken waste washed down the hill into the creek, where the current carried it onto the Nugents' bottomland pasture. During the summer of 1991, several of the Nugents' cattle sickened and died.

The Nugents were sufficiently alarmed in 1991 to have their soil tested in the affected area. The tests showed elevated amounts of arsenic and selenium, chemicals found in the waste from chicken production. Tests on two of the dead cattle pointed to arsenic poisoning as a possible cause of death. However, the evidence also shows that the Nugents themselves had had Pilgrim spread chicken manure on their own land. Apparently, little, if any, flooding occurred during the next two years.

On September 1, 1992, the Nugents saw a truck dump an oily substance in a pit uphill from their farm. The Nugents entered on the Carpenter Place and obtained samples for testing. These tests showed high concentrations of toxic chemicals, including toluene, arsenic, and fecal coliform bacteria. When heavy rains resumed, silt and chicken manure from the Carpenter Place, including waste oil and chemicals from the pit, washed down the creek onto the Nugents' land. The aggregate effect of the several overflows was the destruction of desirable pasture grasses and their replacement by coarse water grass. After rains the creek had an oily slick on it. According to Susan Nugent, the songbirds have forsaken the area, leaving it a haunt for buzzards and crows.

The Nugents moved from their home on the farm in 1995 and rented it to another family. They leased the pasture to another rancher, who grazes cattle on the farm. The Nugents insist they were forced to abandon their home because of Defendants' activities. Tests showed arsenic contamination present in the soil "well above natural background averages." There is evidence that Defendants' feed mill discharged airborne contaminants, which drifted with the wind onto the Nugents' farm and contributed to their inability to use or enjoy their property.

In 1994, Susan Nugent was diagnosed with squamous cell carcinoma, a skin cancer. Her treating physicians did not relate the cancer to exposure to arsenic or other contaminants. However, Dr. Andrew Campbell, in his affidavit prepared in response to Pilgrim's Pride's motion for summary judgment, stated that, in all reasonable medical probability, her "exposure to arsenic, toluene, bacterial agents from chicken manure, lead, and selenium resulted in the damage to her immune system and caused her to be predisposed to multiple myeloma, caused squamous cell cancer and chronic inflammatory demyelinating polyneuropathy (CIDP)...." He also attributed damage to her immune and endocrine systems to her exposure to these chemicals and bacteria. In his opinion, these same agents caused Ray Nugent's CIDP and predisposed him to other health problems, including an elevated risk of cancer. The Nugents filed their suit on August 30, 1994, almost exactly two years after Susan Nugent saw a truck dump oily waste in the pit on the Carpenter Place.

Pilgrim's Pride and Patrick Pilgrim moved for summary judgment on the following grounds: 1) that there was no evidence of one or more essential elements of the Nugents' claims, 2) that all of the Nugents' causes of action were barred by the applicable statutes of limitations, 3) the causes of action for ultra-hazardous activity/strict liability and assault as pleaded by the Nugents do not give rise to cognizable causes of action, 4) that the Nugents had failed to present evidence of each element of their claim for trespass, and 5) the Nugents cannot establish each element of their claim of negligence per se or loss of use and enjoyment. Since the trial court did not state its ground for granting the motion, the nonmovants must show that each ground asserted in the motion is insufficient to support the judgment. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76,

79 (Tex.1989). In order to prevail, the summary judgment movant must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). In reviewing a no-evidence motion for summary judgment, an appellate court must review the evidence in the light most favorable to the respondent against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). A no-evidence summary judgment is improper if there is more than a scintilla of probative evidence raising a material fact. TEX.R.CIV.P. 166a(i). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711.

■ The Appellees contend that all of the Nugents' causes of action are barred by limitations. The Nugents argue that the discovery rule delayed the start of the limitations period. A defendant who moves for summary judgment based upon limitations bears the burden of negating the discovery rule at the summary judgment stage. *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex.1998); *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 n. 2 (Tex.1988). Typically, inquiries involving the discovery rule raise questions to be decided by the trier of fact, although the trial court may determine the commencement of limitations as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts set forth in the record. *Childs*, 974 S.W.2d at 44.

■ Before the hearing on the motion for summary judgment, Defendants moved to strike several of the evidentiary affidavits filed by the Nugents. The trial court did not rule on Defendants' motions to strike. Defendants contend that their objections to the affidavits' defects in form are preserved on appeal. However, challenged evidence remains part of the summary judgment proof unless an order sustaining the objection is reduced to writing, signed, and entered of record. *Cain v. Rust Indus. Cleaning Servs., Inc.*, 969 S.W.2d 464, 467 (Tex.App.—Texarkana 1998, pet. denied); *Eads v. Am. Bank, N.A.*, 843 S.W.2d 208, 211 (Tex.App.—Waco 1992, no writ).

### THE LAND DAMAGE CLAIM

■ The Nugents claim that the Defendants' negligence or gross negligence resulted in temporary damage to their farm. A suit for damage to land and for personal injury must be brought not later than two years after the cause of action accrues. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a) (Vernon Supp.2000). The determination of the accrual date depends upon whether the damage to the Nugent farm is characterized as permanent or temporary. "An action for permanent damages to land accrues, for limitation purposes, upon discovery of the first actionable injury...." *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984) (citing *Tennessee Gas Transmission Co. v. Fromme*, 153 Tex. 352, 269 S.W.2d 336 (1954)). Defendants argue that the Nugents' evidence shows a permanent damaging beginning in May 1991 and that their suit is therefore barred. However, if the damage is temporary, then the Nugents may recover their damages sustained since two years prior to the filing of suit. Both the Nugents and the Appellees rely on the distinction drawn between permanent and temporary land damage by the Supreme Court in its *Bayouth* opinion.

The character of an injury as either permanent or temporary is determined by its continuum. Permanent injuries to land result from an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely; the injury must be constant and continuous, not occasional, intermittent or recurrent. Temporary injuries, however, have been found

where the injury is not continuous, but is sporadic and contingent upon some irregular force such as rain.

*Bayouth,* 671 S.W.2d at 868; *accord Atlas Chem. Indus., Inc. v. Anderson,* 524 S.W.2d 681, 684 (Tex.1975).

The Nugents filed this action on August 30, 1994, two days short of two years after Defendants' sump waste was illegally dumped in a pit on the adjoining farm. They emphasize that their suit is for temporary damage beginning with an incident independent from Defendants' earlier stockpiling and spreading of huge amounts of chicken waste on the Carpenter Place and the resulting contamination and silting of their property during the heavy rains of May 1991.

The Nugents stress that the damage to their land from the overflow of chicken waste and silt was not continuous, but sporadic and contingent upon a hard rain. Injury to the property from the feed mill operation depends upon wind direction and velocity. They contend that the damage is temporary because the acts causing it could have been terminated by injunction. *Citing Kraft v. Langford,* 565 S.W.2d 223 (Tex.1978). They point out that the dumping of sump waste was an isolated incident and maintain that Defendants have ceased stockpiling and spreading chicken manure uphill from the creek.

Where the injury is sporadic and contingent upon some irregular force such as wind or rain, Texas courts hold the injury to be temporary. In *Kraft* the court held that flooding caused by a storm drainage system diverting the direction of the surface drainage, which occurred only with heavy rains, was a temporary injury. *Kraft,* 565 S.W.2d at 227. Although the flood waters constituted an injury, between storms the water receded and did not pose a problem. In *Gulf Coast Sailboats, Inc. v. McGuire,* 616 S.W.2d 385 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), the plaintiffs complained that fiberglass particles and an odor from a plant traveled with the wind onto their property. But when the wind shifted no injury remained. The fiberglass particles and odor did not pose long-lasting problems. The injury was held to be temporary. In *Austin & N.W. Ry. Co. v. Anderson,* 79 Tex. 427, 15 S.W. 484 (1891), the plaintiff alleged that in 1851 the Railway had constructed its roadbed and culverts in a manner that changed the natural flow of the surface water from ordinary rains. As a result, the water collected and overflowed onto plaintiff's land, submerging it for long periods of time and washing away the soil. Plaintiff alleged that his crops were destroyed in 1886, 1887, and 1888. The defendant contended that all claims were barred by limitations, since plaintiff's cause accrued upon the building of the roadbed. The Commission of Appeals held that the statute of limitations did not begin to run from the construction of the road, but from the occurrence of each overflow. Since the injury was not constant and continuous, each overflow constituted a separate cause of action. *Anderson,* 15 S.W. at 485. In *Parsons v. Uvalde Elec. Light Co.,* 106 Tex. 212, 163 S.W. 1 (1914), plaintiff sought damages resulting from defendant's operation of its generator plant. The injury occurred "from time to time during the operation of the said machinery by reason of the smoke, dust, [and] cinders...." The electric company maintained that plaintiff's cause arose upon the inception of plant operations, and therefore was barred by limitations. The court held that although the plant was permanent, the smoke and cinders that caused the injury were only intermittently carried by the wind onto plaintiff's property. Hence, the damage was temporary. *Parsons,* 163 S.W. at 2.

Appellees argue that the Nugents' own evidence showed that they sustained damage in the flood of 1991 sufficiently severe to cause them to have tests made confirming the presence of contaminants in the soil. Appellees rely heavily on *Tennessee Gas Transmission Co. v. Fromme,* 153 Tex. 352, 269 S.W.2d 336, wherein the

plaintiff sought damages for the defendant's negligence in permitting water containing harmful chemicals to flow from its compressor station upon her land. Plaintiff filed her suit in 1952. The facts showed that water was wrongfully discharged from the compressor station onto the plaintiff's land as early as February 1948, and continuously flowed thereon until diverted by the plaintiff in September 1950. While acknowledging that the greater part of the damages occurred within the two years next preceding the filing of the suit, the court held that her cause accrued when the water first began to flow upon her land. Holding limitations barred Fromme's right of action, the court stated, as follows:

> Where there is a direct invasion of one's property of a permanent character, and the original invasion and its continuance are necessarily injurious, the damage is original, and may he at once be fully compensated. In such case the statute begins to run from the date of the invasion.

*Fromme*, 269 S.W.2d at 337 (quoting 28 Tex.Jur. *Limitation of Actions* § 66). The Court quoted from the early case of *Houston Water–Works Co. v. Kennedy*, 70 Tex. 233, 8 S.W. 36, 37 (1888), to the following effect:

> If, however, the act of which the injury was the natural sequence was a legal injury,—by which is meant an injury giving cause of action by reason of its being an invasion of a plaintiff's right,— then, be the damage however slight, limitation will run from the time the wrongful act was committed, and will bar an action for any damages resulting from the act, although these may not have been fully developed until within a peri-

od less than necessary to complete the bar.

Appellees also cite *Vann v. Bowie Sewerage Co.*, 127 Tex. 97, 90 S.W.2d 561, 562 (1936). In *Vann*, plaintiffs bought a 100–acre farm downstream from a large septic tank operated by defendants. The septic tank regularly leaked foul effluent into the creek. Plaintiffs apparently bought the property during the dry season, since they claimed to be ignorant of the situation when they purchased the farm. Polluted water regularly found its way downstream "after each recurring rainfall." The Commission of Appeals held the damage permanent and found that any right of action accrued to the former owner when the polluted effluent first appeared in the creek on the subject property. Therefore, no cause for the pollution of the creek accrued to the plaintiff buyers. Absent a transfer of their vendor's claim, plaintiffs had no right of action.

The governing rule can be plainly and simply stated; however, as is frequently the case with commandments, its application to the facts involved in each case has been a continuing problem.[1] *See Baker v. City of Fort Worth*, 146 Tex. 600, 210 S.W.2d 564, 566 (1948). Most of the cases in which the courts have struggled to distinguish permanent from temporary damages have involved permanent structures or facilities. The construction of a permanent structure or facility may in itself invade a property right of the plaintiff, immediately giving rise to a cause of action for permanent damages. However, the permanent character of the facility does not necessarily brand as permanent the damages resulting from its operation. Yet it is perhaps noteworthy that in most if not

---

1. "The question here presented is not without extreme difficulty. It is one that has been passed upon by the courts of doubtless every state in the Union, and has been the subject of much discussion by text-writers, and yet there seems to be much confusion among the authorities as to when the statute begins to run in a case of this kind. An earnest effort on our part to reach a conclusion with which the utterances of the leading text-writers and the decisions of the courts of last resort in the states in which this question has most frequently arisen could be reconciled has proven in vain, and the result of our investigation is far from satisfactory." *Missouri, K & T Ry. Co. v. Anderson*, 194 S.W. 662, 664 (Tex.Civ. App.—Fort Worth 1917, no writ).

all those instances where damages have been held to be permanent and hence barred by limitations, a permanent facility or structure was the culprit, and the damage causing activity was continuous and presumably would have continued indefinitely.

In the often-cited and comparatively modern case of *Atlas Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681 (Tex.1975), the Supreme Court defined permanent damages as follows:

> Permanent damages result from an activity which is "of such a character and existing under such circumstances that it will be presumed to continue indefinitely"; "the injury must be constant and continuous, not occasional, intermittent or recurrent."

*Atlas Chem. Indus.*, 524 S.W.2d at 684 (quoting 58 AM.JUR. 2d *Nuisance* § 117). In that case, the court confronted facts roughly analogous to those before us.

In 1922, Atlas Chemical began operating a plant making activated carbon from lignite. The process produced washwater containing acid, fly ash, carbon, and lignite particles. Atlas Chemical discharged the polluted washwater into a creek that flowed onto the plaintiff Anderson's land. Anderson claimed temporary damages resulting from the deposits left by the water on sixty acres of his farm. There was evidence that the damage to most of the sixty acres was not constant, but occurred only during severe winter floods and that, at the most, only three to four acres along the creek had been continuously affected by the polluted effluent. The floods of 1967 and 1968 had left abnormally large accumulations of lignite sediment on the Anderson farm, at some places ten inches in depth.

Atlas attacked the jury's finding of temporary damage as without support in the evidence, and argued that there had been continuous pollution and consequent damage to Anderson's land since the inception of plant operations in 1922. Therefore, Atlas argued that the damage was perma-

nent as a matter of law, that the cause of action arose at the first injury in 1922, and that Anderson's suit was time barred.

In concluding that the damage was temporary, the Supreme Court followed the rationale underlying its decision in the early case of *Rosenthal v. Taylor*.

> [T]he controlling rule in actions for injuries resulting from similar nuisances would seem to be to adopt in each case that measure of damages which is calculated to ascertain in the most certain and satisfactory manner the compensation to which the plaintiff is entitled. When the injury is liable to occur only at long intervals, or when the nuisance is likely to be removed by any agency, the damages which have accrued only up to the time of the action will be allowed; but if the nuisance is permanent, and the injury constantly and regularly recurs, then the whole damage may be recovered at once.

*Atlas Chem. Indus.*, 524 S.W.2d at 686 (quoting *Rosenthal v. Taylor*, 79 Tex. 325, 15 S.W. 268 (1891)).

The court reasoned that between 1922 and 1967 the damage to the sixty acres had not been constant and that only a four-acre area adjacent to the creek had been continuously affected by the polluted effluent. It observed that a normal rain would not overflow the sixty acres, whereas a three-or four-inch rainfall would. The creeks did overflow and cover the sixty acres in 1968, as they had in times past, but the winter floods of 1967 and 1968 had left deposits that were greater and different from prior years. *Atlas Chem. Indus.*, 524 S.W.2d at 686.

The court distinguished *Fromme*, observing that in *Fromme* the cause of injury was water discharged from a plant that "continuously flowed" onto the land in question. *Atlas Chem. Indus.*, 524 S.W.2d at 687. Similarly, in *Vann v. Bowie Sewerage Co.*, the polluted water had been continually discharged since the septic tank had been put in operation years be-

fore, and had "regularly" found its way to the plaintiffs' farm "after each recurring rainfall." *Vann*, 90 S.W.2d at 562.

■ The arguments supporting the Nugents' contention that their damages are temporary are even more compelling than those in *Atlas Chemical*. The injuries to their land from the Defendants' use of the Carpenter Place are more "sporadic," "occasional," and "intermittent" than the plaintiff's in *Atlas Chemical*. As much as two years passed between the flood causing the first overflow of chicken manure until the next overflow. Nor does the cumulative damage to the Nugent farm appear any more serious. The evidence does not tell us how long the elevated arsenic levels will remain. But we do know that the farm is still used for cattle grazing.

The Defendants did not build a facility on the Carpenter Place whose removal would have been economically impractical and from whose permanence and character, one should have presumed that its injurious activities would "continue indefinitely." The spreading of large amounts of chicken manure, even the stockpiling of it, constitutes an easily abatable nuisance, an activity which could be discontinued without unreasonable cost.

> Another characteristic of a temporary injury is the ability of a court of equity to enjoin the injury causing activity. An injury that can be terminated cannot be a permanent injury.

*Kraft*, 565 S.W.2d at 227. The damage-causing activity in the instant case was of a character which made it "likely to be removed by any agency." *See Rosenthal*, 15 S.W. at 269.

There is more than a scintilla of evidence supporting the Nugents' claims of damage to their farm from Defendants' negligence. We conclude that, if proven, that damage is temporary. Therefore, the trial court erred in granting summary judgment foreclosing the Nugents' right of recovery for the successive injuries occurring on or after September 1, 1992.

### THE PERSONAL INJURY CLAIM

Susan Nugent's skin cancer was discovered in 1994. Her doctor did not relate the cancer to her exposure to arsenic, selenium, or other contaminants. Three more years elapsed before Dr. Campbell told her that the contaminants in the air and pasture where she worked probably caused the cancer. Sometime after 1994, both she and her husband were diagnosed as suffering from chronic inflammatory demyelinating polyneuropathy (CIDP). In his affidavit Dr. Campbell stated that Susan Nugent's skin cancer and the CIDP from which both she and her husband suffer were in all reasonable medical probability caused by their exposure to the contaminants that had polluted their farm.

Appellees contend the Nugents' personal injury claims are also time barred, because the Nugents discovered their first actionable injury in May of 1991 but did not file suit until August 30, 1994. The Nugents invoke the discovery rule, insisting that their injuries are not traumatic but latent diseases, inherently undiscoverable within two years of the first massive contamination of their property. Susan Nugent's skin cancer was not diagnosed until 1994. It was years later before a doctor identified their other illnesses and pointed to the pollution of the air and pasture as their probable cause.

■ The pertinent statute provides that a person must bring suit for personal injury not later than two years after the day the cause of action accrues. TEX.CIV. PRAC. & REM.CODE ANN. § 16.003(a). Generally, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later or all resulting damages have not yet occurred. *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996). The discovery rule is an exception to the general rule. *Id.* If applicable, it delays the accrual of the cause until the plaintiff knows or in the exercise

of reasonable diligence should know of the wrongful act and the resulting injury. *Id.* The application of the discovery rule is appropriate when "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Id.* at 6.

Latent occupational disease claims typify the type of case for which the discovery rule was crafted. Our Supreme Court recently observed:

> [A] plaintiff who suffers from a latent injury or disease typically does not and cannot immediately know about the injury or its cause because these injuries often do not manifest themselves for two or three decades following exposure to the hazardous substance. .... [N]o specific date of contact with the harmful substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time. .... [E]ven when symptoms do arise that make the fact of injury objectively verifiable, the injury and its etiology are difficult to diagnose and ascertain because of the lengthy latency period, the many potential causes of the specific symptoms, and some physicians' lack of education and experience in identifying occupational diseases.

*Childs*, 974 S.W.2d at 38 (citations omitted). Accrual is deferred in such cases "until a plaintiff's symptoms manifest themselves to a degree or for a duration that would put a reasonable person on notice that he or she suffers from some injury and he or she knows, or in the exercise of reasonable diligence should have known, that the injury is likely work-related." *Childs*, 974 S.W.2d at 40–41. A diligent plaintiff's mere suspicion or subjective belief that a causal connection exists between his exposure and his symptoms is, standing alone, insufficient to establish accrual as a matter of law. *Id.*

As movants for summary judgment, defendants have the burden of proving the inapplicability of the discovery rule. Appellees argue that the Nugents were required to file suit within two years after they became aware of facts authorizing a judicial remedy. The Nugents knew in May 1991 that their land had been flooded with contaminants, two cows had probably died from arsenic poisoning, and soil tests showed elevated levels of arsenic in the pasture. Therefore, they contend the Nugents were required to file suit for all their injuries, for personal injuries as well as for real property damage, within two years of May 1991. This result is mandated, say the Appellees, by the "single action rule," which provides that there is but one cause of action for all damages arising out of a defendant's wrongful act. *Citing Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1137 (5th Cir.1985), and *Pustejovsky v. Pittsburgh Corning Corp.*, 980 S.W.2d 828, 830 (Tex.App.—San Antonio 1998, pet. granted). They argue that the fact that the plaintiffs' actual damages may not be fully known until later does not affect the accrual date. *Pustejovsky*, 980 S.W.2d at 831. They contend that the fact that an injury may be undiscoverable until barred by limitations and a legal remedy foreclosed before the victim knows she is injured is "an unfortunate, occasional by-product of the operation of limitations." *See Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex. 1977).

The single action rule evolved to facilitate repose, retard the litigation of stale claims, and conserve judicial resources. *See Wilson v. Johns–Manville Corp.*, 684 F.2d 111, 119–21 (D.C.Cir.1982). In *Pustejovsky*, a doctor found scarring in the plaintiff's lungs and diagnosed his condition as asbestosis. Pustejovsky sued Johns–Manville and settled his claim for $25,000.00. Almost ten years later, Pustejovsky was diagnosed with terminal mesothelioma, a cancer of the lining of the lungs. Both diseases are caused by breathing asbestos fibers, although mesothelioma is not dependent on a precondi-

tion of asbestosis, and less than fifteen percent of those with asbestosis develop mesothelioma. Nevertheless, the San Antonio Court of Appeals held that, under the single action rule, Pustejovsky's cause of action accrued when he first learned he had asbestosis resulting from his occupational exposure to asbestos. Therefore, his claim was barred.

▇▇▇ Appellees rely heavily on the opinion in *Pustejovsky*. The Supreme Court granted writ and the case is still pending in the Supreme Court. We conclude that it is too frail a precedent to mandate the application of the single action rule to nullify the discovery rule in latent injury contamination cases, such as the case at bar. Many, if not most, other jurisdictions that have confronted the question have declined to apply the single action rule in latent injury cases. We too are of the opinion that the law of Texas does not require a plaintiff to file suit for injuries he could not have remotely anticipated and whose likely future occurrence he could not possibly prove.[2]

Most of the cases cited in *Pustejovsky* appear irrelevant to the issue in the instant case. The cited cases dealing with latent injuries are asbestosis cases, and even these are distinguishable.

In automobile collision and kindred cases, any associated personal injuries are the natural result of the same trauma that damages the property involved. The utility and equity of the single action rule in such situations is as obvious as its application is easy. Although asbestosis is not a necessary precondition for the development of lung cancer, inhalation of asbestos fibers is at least a well-known cause of both. However, to the ordinary person there is absolutely no relationship between a massive overflow of chicken manure onto a pasture and the later development of skin cancer and CIDP by those who work

there. Skin cancer and CIDP are simply not part of the sequence of harms which might be anticipated from the contamination resulting from Defendants' alleged conduct in this case. On the other hand, lung cancer is a harm at least commonly associated with the inhalation of asbestos fibers.

We are of the opinion that the court of appeals' decision in *Pustejovsky* is in conflict with the Supreme Court's recent holding in *Childs v. Haussecker*. In *Childs*, Haussecker brought a malpractice suit against Childs alleging that Childs had erroneously and negligently advised him that the statute of limitations barred his silicosis-related claim. Haussecker worked at various jobs for AMF Tuboscope, where he was exposed to and inhaled significant quantities of silica dust and sand, as well as toxic fumes. When he first experienced serious respiratory problems between September 1967 and May 1968, he consulted three doctors, including a pulmonary specialist. During that period, his condition was variously diagnosed as prostate problems, lymphoma or Hodgkin's disease, and granuloma of the right lung. The two doctors that expressed an opinion on the subject told him that his illness was not work-related. However, because one of Haussecker's co-workers had died of work-related silicosis and others had health problems similar to his own, he formed his own opinion that he too suffered from silicosis. Haussecker was bedridden from May 1968 until January 1969. In August 1968, he filed for workers' compensation, alleging he had a work-related disease. After his claim was denied, Haussecker sued AMF's carrier, alleging work-related silicosis. Childs eventually took over Haussecker's case, but determined he could not continue the representation because, like two other attorneys who had examined the case, he could

---

2. A plaintiff may recover for future consequences of a tort only by establishing that the consequences are reasonably certain, i.e., there is a greater than fifty percent chance that the consequences will result. *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 681 (Tex. App.—Texarkana 1991, writ denied).

find no evidence that Haussecker's condition was work-related or a doctor who would provide a diagnosis of silicosis. The suit was dismissed for want of prosecution in 1972. Haussecker's health continued to deteriorate. He stopped working in 1978 and began receiving Social Security disability.

In 1988, a lung specialist examined Haussecker and informed him that he believed Haussecker had silicosis. The doctor performed a lung biopsy in February 1990 and diagnosed Haussecker with work-related silicosis in April 1990. That same month, Haussecker met with Childs to see if he could re-open the abandoned workers' compensation claim. Childs informed him that too much time had passed for him to do anything about a claim now twenty years old.

In August 1992, Haussecker contacted another lawyer, who filed a products liability suit in April 1993. The trial court granted summary judgment on limitations.

Haussecker then filed the malpractice suit against Childs. The trial court granted summary judgment for Childs on the ground that his potential claims were barred by limitations before he met with Childs in April 1990. The court of appeals reversed and remanded, holding that Haussecker had raised a fact issue about whether the discovery rule saved his claims from being time-barred as of the date he consulted Childs in 1990.

The Supreme Court held that a fact question existed about the knowledge that should be attributed to Haussecker in April 1988, and also as to whether Haussecker from 1978 until 1988 reasonably abandoned pursuing his suspicion that his respiratory problems were work-related. The Supreme Court held that Childs was not entitled to summary judgment.

In applying the discovery rule, the Supreme Court noted that "the value of requiring plaintiffs to bring a claim within a fixed period of time may be outweighed in some latent injury cases by 'the inequity of depriving a reasonably diligent plaintiff of an opportunity to seek redress at all.' " *Childs*, 974 S.W.2d at 39. The rule crafted by the court held that "when the discovery rule applies, accrual is tolled until a claimant discovers or in the exercise of reasonable diligence should have discovered the injury and that it was likely caused by the wrongful acts of another." *Childs*, 974 S.W.2d at 40. The Supreme Court in its opinion explained further that:

> [A] latent occupational disease cause of action should not be deemed to accrue absent some objective verification of a causal connection between injury and toxic exposure, provided that the failure to obtain that verification is not occasioned by a lack of due diligence. Accordingly, a diligent plaintiff's mere suspicion or subjective belief that a causal connection exists between his exposure and his symptoms is, standing alone, insufficient to establish accrual as a matter of law.

*Childs*, 974 S.W.2d at 43.

■ Viewed in the light most favorable to the nonmovant, the summary judgment evidence in the instant case shows the Nugents were not aware of any of their contamination-related illnesses before 1994. They filed their suit in 1994. Three years passed before Dr. Campbell's diagnosis confirmed their suspicion that toxic pollutants blowing from the feed mill and overflowing from the Carpenter Place caused their health problems. The Nugents' personal injury claims were not time barred, and the trial court erred in granting summary judgment.

### THE NUISANCE CLAIM

The Nugents also claim the Defendants' stockpiling and spreading of excessive amounts of chicken manure on the Carpenter Place and the emissions from their feed mill constituted a nuisance severe enough to force them from their home.

■ A nuisance is a condition that substantially interferes with the use and

enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use or enjoy it. *Burditt v. Swenson,* 17 Tex. 489, 502 (1856); *Ward v. Northeast Texas Farmers Co-op. Elevator,* 909 S.W.2d 143, 151 (Tex.App.—Texarkana 1995, writ denied). In *Burditt,* the Supreme Court indicated that even something that causes only a well-founded apprehension of danger may be a nuisance. *Burditt,* 17 Tex. at 502. A nuisance may arise by causing (1) physical harm to property, such as by the encroachment of a damaging substance or by the property's destruction, (2) physical harm to a person on his or her property from an assault on his or her senses or by other personal injury, and (3) emotional harm to a person from the deprivation of the enjoyment of his or her property through fear, apprehension, or loss of peace of mind. *Ward,* 909 S.W.2d at 151. To be actionable, it is not necessary that the annoyance should be of a character to endanger health; it is sufficient if it is offensive to the senses and renders the enjoyment of life and property uncomfortable. *Burditt,* 17 Tex. at 502.

The Nugents contend that the nuisances created by the Defendants have damaged their property, injured their health, and are otherwise so offensive to persons of ordinary sensibilities as to cause unreasonable discomfort and apprehension.

The Defendants maintain that the Nugents' cause of action for nuisance accrued with the major overflow of chicken manure onto their property from the Carpenter Place in May 1991. Defendants apparently contend that any right of action for nuisance against them for their operation of the feed mill arose at the same time and any claim is time barred.

■■■ The applicable limitations period is two years. Tex.Civ.Prac. & Rem.Code Ann. § 16.003(a). One cannot ordinarily acquire a prescriptive right to maintain a nuisance. Limitations will not bar a suit to abate a continuing nuisance. *Abbott v. City of Princeton,* 721 S.W.2d 872, 875

(Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Stein v. Highland Park Indep. Sch. Dist.,* 540 S.W.2d 551, 554 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.).

■■■ The Nugents have produced summary judgment evidence, amounting to more than a scintilla, supporting their claim of nuisance. There is proof that their property was damaged by successive overflows of chicken manure and other waste material onto their farm during the period beginning two years immediately preceding the filing of their suit until the present time. There is evidence that their health has been injured, both by the Defendants' operation of the Carpenter Place and by airborne particles from Defendants' feed mill. Finally, there is enough evidence to create a fact issue as to whether Defendants' conduct has caused a well-founded apprehension of danger or unreasonable discomfort or annoyance.

We are of the opinion that the Nugents have produced sufficient evidence in support of their nuisance claim to create a fact issue, and that their claim for damages incurred since September 1, 1992, are not barred by limitations.

### The Trespass Claim

■■■ A trespass to real property is the unauthorized and intentional entry on the land of another. *Ward,* 909 S.W.2d at 150. One may be liable in trespass who intentionally acts to cause or permit a thing to cross the boundary of a property. *Glade v. Dietert,* 156 Tex. 382, 295 S.W.2d 642, 645 (1956). Intent can be shown by proof that, while the actor did not know his conduct would result in trespass, his actions were practically certain to have that effect. *Gen. Tel. Co. v. Bi–Co Pavers, Inc.,* 514 S.W.2d 168, 170 (Tex.Civ.App.—Dallas 1974, no writ). Where trespass results in damage or injury, the trespasser is liable without reference to negligence or due care. *Brown v. Dellinger,* 355 S.W.2d 742, 745 (Tex.Civ.App.—Texarkana 1962, writ ref'd n.r.e.).

Appellees argue that the Nugents "wholly fail to establish that Pilgrim's Pride intended to affect their property or knew its actions were practically certain to result in a trespass."

■ There is evidence that the Defendants dumped and spread unreasonably large amounts of chemical and bacteria-laden chicken manure on the hillside upstream from the Nugent farm and within a few hundred feet from the boundary. Defendants then tilled the soil in a manner that encouraged the erosion of the hillside and the consequent migration of chicken manure and silt onto the Nugent property. Pilgrim's Pride contracted to illegally dump sump waste upstream from the Nugent land, and there is some evidence that some of this material washed onto and contaminated the Nugent farm after very hard rains. Defendants released material into the atmosphere which the Nugents' proof shows contained contaminants which intermittently drifted onto their property. The affidavit of Rod O'Connor attests to the contamination of the Nugents' farm by manure, waste, and airborne particles coming from Defendants' operations.

■ We believe that a fact issue exists as to whether Defendants' actions amounted to trespass. As we have noted, it is not necessary that a defendant be shown to know that his conduct will result in a trespass, but only that it was practically certain to have that effect. A recovery may not be defeated on the ground that the harm done was not a foreseeable consequence of the defendant's conduct. *Dellinger*, 355 S.W.2d at 745.

The limitations period for trespass is also two years. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a). The Nugents' claims for trespass occurring after August 30, 1992, are not time barred. Because a jury question exists as to the character of the Defendants' actions, the trial court erred in granting summary judgment on the trespass claims.

The judgment is reversed, and the cause is remanded to the trial court.

CORNELIUS, C.J., not participating.