MARY'S OPINION HEADING 



 NO. 12-01-00279-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


UNION PACIFIC RESOURCES COMPANY, § APPEAL FROM THE 402ND

APPELLANT



 § JUDICIAL DISTRICT COURT OF



EUGENE H. COOPER AND WIFE,

MARJORIE ANNE COOPER,

APPELLEES § WOOD COUNTY, TEXAS

 

 Union Pacific Resources Company ("UPRC") appeals the trial court's judgment entered in
favor of Eugene H. Cooper and wife, Marjorie Anne Cooper (collectively the "Coopers"), who were
awarded $85,000.00 in damages for their nuisance claim. UPRC raises seven issues on appeal. We
reverse and render.

Background


 On January 30, 1998, the Coopers executed an oil, gas and mineral lease to Bayou Black
Royalty Company ("Bayou Black") on a fifty-acre tract, which included the Coopers' home. (1) Bayou
Black later assigned this lease to UPRC.

 In April 2000, UPRC applied with the Texas Railroad Commission ("TRC") to drill the
Whitetip Well No. 1 ("the well"). All of the Coopers' mineral interest was part of a pooled unit. The
well was to be drilled on an adjoining landowner's property within the pooled unit approximately
seven hundred feet from the Coopers' home. The record reflects that it was common in the area to
encounter hydrogen sulphide gas ("sour gas") when drilling at depths between fifteen and seventeen
thousand feet. (2) Sour gas is poisonous and can cause death to people who come into contact with it. 
Following incidents of death caused by sour gas, the Texas Railroad Commission promulgated its
statewide Rule 36 ("Rule 36"). Rule 36 requires a company which might encounter sour gas in
drilling a well to develop an evacuation plan for members of the general public who are located within
a certain radius of the well. The Coopers' home fell within this radius established by Rule 36.

 UPRC retained Denmon H2S Safety Services, Inc. ("Denmon") of Tyler to develop a
comprehensive contingency plan should sour gas be encountered during the drilling of the well. In
developing this contingency plan, a Denmon employee, Bill Rittenberry ("Rittenberry"), visited the
Coopers' home on May 10, 2000. Rittenberry testified that he explained to the Coopers the necessity
of an evacuation in the event that sour gas was encountered and how this evacuation would be
effectuated. Following Rittenberry's visit to the Coopers and others who might be evacuated,
Denmon filed an evacuation plan with the TRC. The TRC approved Denmon's plan before UPRC
began drilling the well.

 In early June 2000, UPRC instructed its landman, (3) Ken McKinley ("McKinley"), to meet on
at least a weekly basis with the Coopers while the well was being drilled to address any concerns or
needs they might have. McKinley first met with the Coopers in their home on June 9, 2000. Mrs.
Cooper told McKinley that she believed that considering Mr. Cooper's infirmity, they would require
at least forty-five minutes to evacuate their home. McKinley testified that it was quickly apparent the
Coopers were anxious to leave their home while the well was being drilled and that UPRC
immediately acceded to the Coopers' wishes. Mrs. Cooper testified that she had been told by her
brother, a retired Dallas fireman, that if they smelled rotten eggs, it was sour gas and they would be
sure to die. Mrs. Cooper testified that her brother's remark led her and her husband to believe that
it was imperative that they vacate their home while UPRC drilled the well.

 The Coopers made arrangements with Barbara Sjerven ("Sjerven") to rent her unoccupied
farmhouse (the "farmhouse"). On June 27, Sjerven paid Fouke Water Supply Corporation of Wood
County, Texas $2,350.00 to hook up a water meter at the farmhouse. UPRC reimbursed Sjerven for
the meter installation expense.

 On July 24, McKinley met with the Coopers to determine how they would be reimbursed for
their expenses while renting the farmhouse from Sjerven. As a result of the meeting, the parties
agreed that the Coopers would be paid $1,500.00 per month for the time that they lived in the
farmhouse. Further, UPRC would pay Mrs. Cooper and her sister an additional $1,020.00 for their
labor expended in cleaning up the farmhouse before moving in. Finally, UPRC agreed to purchase
a freezer for the Coopers to use during their stay at the farmhouse to enable the Coopers to keep the
bulk of their frozen food at their home so that they would not have to move it. 

 The Coopers moved into the Sjerven farmhouse on August 12, 2000. On August 18, 2000, 
McKinley visited the Coopers at the farmhouse and attempted to make payments to the Coopers
pursuant to the agreement. However, the Coopers told him that they had filed suit against UPRC on
August 11 and had been instructed by their attorney to refuse UPRC's payments. On September 1,
2000, UPRC drilled below fifteen thousand feet where it was anticipated that sour gas might be
encountered, but no sour gas was present. Later that month, it was determined that the well was a dry
hole. Sometime after September 20, the Coopers moved back into their home.

 The Coopers prosecuted their suit against UPRC seeking damages under theories of nuisance
and quantum merit. Following a jury trial, the trial court awarded the Coopers $85,000.00 in damages
based upon their nuisance claim. The jury found no damages for the Coopers based on their quantum
merit claim. (4) 


Nuisance Claim Based on Fear and Apprehension


 In the third of its seven issues, UPRC contends that the trial court erred in overruling its
objection to the trial court's submission of the Coopers' nuisance issue to the jury. UPRC argues that
the Coopers' nuisance claim is unsupportable because it is based solely on fear and apprehension, and
consequently, there is no evidence to support submission of the issue. (5) 

 The standard of review for charge error is whether the trial court abused its discretion. Texas
Dep't of Human Servs. v. E. B., 802 S.W.2d 647, 649 (Tex. 1990). To determine whether an alleged
error in the jury charge is reversible, the reviewing court must consider the pleadings of the parties,
the evidence presented at trial, and the charge in its entirety. Island Recreational Dev. Corp. v.
Republic of Tex. Sav. Ass'n, 710 S.W.2d 551, 555 (Tex. 1986). Alleged error will be deemed
reversible only if, when reviewed in the light of the totality of these circumstances, it amounted to
such a denial of the rights of the complaining party as was reasonably calculated and probably did
cause the rendition of an improper judgment. Id. 

 In determining UPRC's "no-evidence" issue, we are to consider all of the evidence in the light
most favorable to the party in whose favor the judgment has been rendered, and to indulge every
reasonable inference from the evidence in that party's favor. Merrell-Dow Pharm. v. Havner, 953
S.W.2d 706, 711 (Tex. 1997). A "no-evidence" issue may only be sustained when the record
discloses one of the following: (1) there is a complete absence of evidence of a vital fact; (2) the court
is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of the evidence; or
(4) the evidence established is conclusively the opposite of a vital fact. Id. We must determine if
there was some evidence to support the trial court's presentment of this nuisance question to the jury. 
See Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992).

 In Texas, a nuisance can occur in one of three ways: (1) by physical harm to property, such
as the encroachment of a damaging substance or by the property's destruction; (2) by physical harm
to a person on his or her property, such as an assault on his or her senses or by other personal injury;
or (3) by emotional harm to a person from the deprivation of the enjoyment of his or her property,
such as fear, apprehension, offense, or loss of peace of mind. See Maranatha Temple v. Enterprise
Products, 893 S.W.2d 92, 99 (Tex. App.-Houston [1st Dist.] 1994, writ denied). UPRC contends that
the Coopers only rely on the third category of harm comprising nuisance-in-fact, i.e., emotional harm
to a person from the deprivation of the enjoyment of his or her property.

 The Coopers' nuisance claim was based on evidence at trial that they vacated their home
because of the threat of sour gas. However, their own expert witness, James Smith, stated that an
evacuation plan could have been structured to allow the Coopers to stay in their home while the well
was being drilled. There is no evidence of record that Smith ever told the Coopers that it was
imperative that they evacuate their home due to the possibility that sour gas could be encountered
during UPRC's drilling of the well. To the contrary, the record reflects that Mrs. Cooper's brother
was the only person who told them they had to leave their home because of the possibility that sour
gas could be encountered.

 Mrs. Cooper testified that she and her husband believed that they were going to die if they
stayed in their home. Yet the record sets forth no instances of anyone ever dying when sour gas was
encountered at a depth of fifteen thousand feet during the drilling of a well. To the contrary, the
record reflects that none of the witnesses who testified had ever heard of anyone being evacuated for
more than one night while a well was being drilled that could potentially encounter sour gas. 
Rittenberry's uncontroverted testimony was that, even if the sour gas escaped the drilling process, it
would probably take up to a full day for it to reach the earth's surface three miles up. No witness
testified that he had encouraged the Coopers to leave their home and live in the farmhouse for a month
and a half. The only evidence presented during the trial which explained the Coopers' motivation to
evacuate their home during UPRC's drilling of the well was testimony that Mrs. Cooper's brother told
Mrs. Cooper that she and her husband would die if they smelled sour gas. However, there is no
evidence of record that Mrs. Cooper's brother was qualified as an expert on the subject. 

 UPRC contends that we should follow the holding in Maranatha, that under certain
circumstances, issues of public policy dictate that a nuisance-in-fact cause of action cannot be based
upon fear, apprehension or other emotional reactions that result from the lawful operation of industries
in Texas. Id. at 100. There, a church, Maranatha Temple, had sued the owners of an underground
petrochemical and hydrocarbon storage well located within eight hundred feet of it. Id. at 95. Among
other causes of action, the church alleged a nuisance was created by the location of the storage well. 
Id. at 96. In Maranatha, as in the case before us, there were no physical injuries.

 In addressing the church's nuisance claim, the Maranatha court concluded:


 Texas is a state where industry, and particularly energy-related industry, is openly abundant. If we were
to allow a cause of action to persons who have not been harmed, in their land or body, by the lawful
operation of an industry, but who are afraid that one day they will be, we would be opening our courts
to a potential torrent of litigation. Persons who are apprehensive that one day in the future an industrial
accident will harm them or their property could sue for their apprehension alone. Yet, doubtlessly,
almost every Texas resident has experienced such apprehension at one time or another. For us to allow
this cause of action would lead to a vast number of lawsuits-lawsuits not filed by persons who have
actually been physically injured.



Maranatha, 893 S.W.2d at 100 (emphasis in original).

 The Coopers contend Maranatha is not applicable because it involved captured
petrochemicals and hydrocarbons in a manmade enclosure rather than a highly toxic and deadly gas
that might become uncontrollable. We disagree. The uncontroverted evidence showed that even if
the sour gas escaped the drilling process three miles underground, it would probably take it a full day
to reach the surface. More important, in Maranatha and the case before us, no physical injury
occurred. In both, there was only a fear and apprehension of what might occur. Fear of the unknown
is not a nuisance.

 Citing Nugent v. Pilgrim's Pride Corp., 30 S.W.3d 562, 575 (Tex. App.-Texarkana 2000, pet.
denied), the Coopers argue that their claim for nuisance can be supported by a well-grounded fear or
apprehension. In Nugent, the plaintiffs complained that their property had been damaged by
successive overflows of chicken manure and other waste material onto their farm during the period
beginning two years from the filing of their suit. Id. Further, there was evidence that the plaintiffs'
health had been compromised by the presence of chicken manure on their land and by their breathing
airborne particles from a feed mill operated by the defendants. See id. at 566, 575. Therefore, Nugent
is distinguishable from the instant case. Nugent involved actual physical harm to the plaintiffs'
property and person. Here, the Coopers allege that they were driven from their home by concerns
about what the sour gas might do to them. As such, we conclude that Nugent is inapplicable to the
facts of the case at hand.

 The only evidence of a possible nuisance which caused the Coopers to leave their home was
based on fear, apprehension, and other emotional reactions stemming from what they had been told
by Mrs. Cooper's brother. Since no sour gas was ever encountered, no physical harm was shown by
the Coopers. Therefore, we conclude that the Coopers presented no evidence which established a
viable claim for nuisance. Consequently, based on the specific facts and circumstances in the instant
case, and considering issues of public policy in Maranatha as set forth above, there was no evidence
to support the submission of the Coopers' nuisance claim to the jury. In so doing, the trial court
abused its discretion. UPRC's third issue is sustained. (6) 

 Accordingly, we reverse the judgment of the trial court and render judgment that Coopers take
nothing against UPRC.


 JIM WORTHEN 

 Justice


Opinion delivered November 27, 2002.

Panel consisted of Gohmert, Jr., C.J., Worthen, J., and Griffith, J.





















(PUBLISH)
1. The Coopers actually owned a 100-acre tract, but only owned the mineral rights under half of the tract.
2. There are 5,280 feet in one mile. Thus, the sour gas here would have been around three miles from the
earth's surface.
3. McKinley testified that his job responsibilities as they related to the case at hand included (1) settling
surface damages with the surface owner for the drill site, (2) coordinating the potential construction of a pipeline if
one was ultimately needed, and (3) dealing with other surface issues that surface owners might have.
4. No appeal has been made by either party concerning the quantum merit claim. Therefore, we do not
discuss such a claim in this opinion.
5. During the charge conference, UPRC objected to the nuisance claim in its entirety, stating that the
Coopers had only shown that they left their home because of fear and apprehension and asked the court not to submit
the nuisance claim because there was no evidence to support its submission. The trial court denied UPRC's
objection. In determining whether a party has preserved error in the jury charge, we consider whether the party made
the trial court aware of the complaint, timely and plainly, and obtained a ruling. State Dep't of Hwys. v. Payne, 838
S.W.2d 235, 241 (Tex. 1992). Based on our review of the record, we conclude that UPRC did preserve error with
regard to this issue.
6. Since our determination of UPRC's third issue is dispositive of the case, we need not address its other
issues.