**UNION PACIFIC RESOURCES COMPANY, Appellant,**

v.

**Eugene H. COOPER and Wife, Marjorie Anne Cooper, Appellees.**

**No. 12–01–00279–CV.**

Court of Appeals of Texas, Tyler.

Jan. 22, 2003.

Martin P. Detloff, Union Pacific Resources Company, Houston, for appellant.

Deborah J. Race, Otis Carroll, Ireland Carroll & Kelley, P.C., Tyler, for appellee.

Panel consisted of WORTHEN, C.J., and GRIFFITH, J.

## OPINION ON MOTION FOR REHEARING

JAMES T. WORTHEN, Chief Justice.

The Appellees' motion for rehearing is denied. However, the opinion issued in this case on November 27, 2002, is withdrawn, and the following opinion is issued in its place.

Union Pacific Resources Company ("UPRC") appeals the trial court's judgment entered in favor of Eugene H. Cooper and wife, Marjorie Anne Cooper (collectively the "Coopers"), who were awarded $85,000.00 in damages for their nuisance claim. UPRC raises seven issues on appeal. We reverse and render.

### BACKGROUND

On January 30, 1998, the Coopers executed an oil, gas and mineral lease to Bayou Black Royalty Company ("Bayou Black") on a fifty-acre tract, which included the Coopers' home.[1] Bayou Black later assigned this lease to UPRC.

In April 2000, UPRC applied with the Texas Railroad Commission ("TRC") to drill the Whitetip Well No. 1 ("the well"). All of the Coopers' mineral interest was part of a pooled unit. The well was to be drilled on an adjoining landowner's property within the pooled unit approximately seven hundred feet from the Coopers' home. The record reflects that it was common in the area to encounter hydrogen sulphide gas ("sour gas") when drilling at depths between fifteen and seventeen thousand feet.[2] Sour gas is poisonous and can cause death to people who come into contact with it. Following incidents of death caused by sour gas, the Texas Railroad Commission promulgated its state-

---

1. The Coopers actually owned a 100–acre tract, but only owned the mineral rights under half of the tract.

2. There are 5,280 feet in one mile. Thus, the sour gas here would have been around three miles from the earth's surface.

wide Rule 36 ("Rule 36"). Rule 36 requires a company which might encounter sour gas in drilling a well to develop an evacuation plan for members of the general public who are located within a certain radius of the well. The Coopers' home fell within this radius established by Rule 36.

UPRC retained Denmon H2S Safety Services, Inc. ("Denmon") of Tyler to develop a comprehensive contingency plan should sour gas be encountered during the drilling of the well. In developing this contingency plan, a Denmon employee, Bill Rittenberry ("Rittenberry"), visited the Coopers' home on May 10, 2000. Rittenberry testified that he explained to the Coopers the necessity of an evacuation in the event that sour gas was encountered and how this evacuation would be effectuated. Following Rittenberry's visit to the Coopers and others who might be evacuated, Denmon filed an evacuation plan with the TRC. The TRC approved Denmon's plan before UPRC began drilling the well.

In early June 2000, UPRC instructed its landman,[3] Ken McKinley ("McKinley"), to meet on at least a weekly basis with the Coopers while the well was being drilled to address any concerns or needs they might have. McKinley first met with the Coopers in their home on June 9, 2000. Mrs. Cooper told McKinley that she believed that considering Mr. Cooper's infirmity, they would require at least forty-five minutes to evacuate their home. McKinley testified that it was quickly apparent the Coopers were anxious to leave their home while the well was being drilled and that UPRC immediately acceded to the Coopers' wishes. Mrs. Cooper testified that she had been told by her brother, a retired Dallas fireman, that if they smelled rotten eggs, it was sour gas and they would be sure to die. Mrs. Cooper testified that her brother's remark led her and her husband to believe that it was imperative that they vacate their home while UPRC drilled the well.

The Coopers made arrangements with Barbara Sjerven ("Sjerven") to rent her unoccupied farmhouse (the "farmhouse"). On June 27, Sjerven paid Fouke Water Supply Corporation of Wood County, Texas $2,350.00 to hook up a water meter at the farmhouse. UPRC reimbursed Sjerven for the meter installation expense.

On July 24, McKinley met with the Coopers to determine how they would be reimbursed for their expenses while renting the farmhouse from Sjerven. As a result of the meeting, the parties agreed that the Coopers would be paid $1,500.00 per month for the time that they lived in the farmhouse. Further, UPRC would pay Mrs. Cooper and her sister an additional $1,020.00 for their labor expended in cleaning up the farmhouse before moving in. Finally, UPRC agreed to purchase a freezer for the Coopers to use during their stay at the farmhouse to enable the Coopers to keep the bulk of their frozen food at their home so that they would not have to move it.

The Coopers moved into the Sjerven farmhouse on August 12, 2000. On August 18, 2000, McKinley visited the Coopers at the farmhouse and attempted to make payments to the Coopers pursuant to the agreement. However, the Coopers told him that they had filed suit against UPRC on August 11 and had been instructed by their attorney to refuse UPRC's payments. On September 1, 2000, UPRC drilled below fifteen thousand feet where it was

---

**3.** McKinley testified that his job responsibilities as they related to the case at hand included (1) settling surface damages with the surface owner for the drill site, (2) coordinating the potential construction of a pipeline if one was ultimately needed, and (3) dealing with other surface issues that surface owners might have.

anticipated that sour gas might be encountered, but no sour gas was present. Later that month, it was determined that the well was a dry hole. Sometime after September 20, the Coopers moved back into their home.

The Coopers prosecuted their suit against UPRC seeking damages under theories of nuisance and quantum merit. Following a jury trial, the trial court awarded the Coopers $85,000.00 in damages based upon their nuisance claim. The jury found no damages for the Coopers based on their quantum merit claim.[4]

### NUISANCE CLAIM BASED ON FEAR AND APPREHENSION

■ In the third of its seven issues, UPRC contends that the trial court erred in overruling its objection to the trial court's submission of the Coopers' nuisance issue to the jury. UPRC argues that the Coopers' nuisance claim is unsupportable because it is based solely on fear and apprehension, and consequently, there is no evidence to support submission of the issue.[5]

■ In reviewing a point complaining that there was no evidence to support the submission of a question to the jury, we look only at the evidence which tends to support the judgment in order to determine if the trial court abused its discretion in submitting the issue. See McFarland v. Sanders, 932 S.W.2d 640, 644 (Tex.App.-Tyler 1996, no writ). We will consider circumstantial evidence and indulge all inferences in favor of the submission. See Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.1983). A trial court may decline to submit a relevant issue, only if there is no evidence to support it. Id. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and is, in legal effect, no evidence. Id.

■ In Texas, a nuisance can occur in one of three ways: (1) by physical harm to property, such as the encroachment of a damaging substance or by the property's destruction; (2) by physical harm to a person on his or her property, such as an assault on his or her senses or by other personal injury; or (3) by emotional harm to a person from the deprivation of the enjoyment of his or her property, such as fear, apprehension, offense, or loss of peace of mind. See Maranatha Temple v. Enterprise Products, 893 S.W.2d 92, 99 (Tex.App.-Houston [1st Dist.] 1994, writ denied). UPRC contends that the Coopers only rely on the third category of harm comprising nuisance-in-fact, i.e., emotional harm to a person from the deprivation of the enjoyment of his or her property.

■ UPRC contends that we should follow the holding in Maranatha, that under certain circumstances, issues of public policy dictate that a nuisance-in-fact cause of action cannot be based upon fear, appre-

---

4. No appeal has been made by either party concerning the quantum merit claim. Therefore, we do not discuss such a claim in this opinion.

5. During the charge conference, UPRC objected to the nuisance claim in its entirety, stating that the Coopers had only shown that they left their home because of fear and apprehension and asked the court not to submit the nuisance claim because there was no evi-

dence to support its submission. The trial court denied UPRC's objection. In determining whether a party has preserved error in the jury charge, we consider whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. State Dep't of Hwys. v. Payne, 838 S.W.2d 235, 241 (Tex.1992). Based on our review of the record, we conclude that UPRC did preserve error with regard to this issue.

hension or other emotional reactions that result from the lawful operation of industries in Texas. *Id.* at 100. In that case, a church, Maranatha Temple, had sued the owners of an underground petrochemical and hydrocarbon storage well located within eight hundred feet of it. *Id.* at 95. Among other causes of action, the church alleged a nuisance was created by the location of the storage well. *Id.* at 96. In *Maranatha,* as in the case before us, there were no physical injuries.

In addressing the church's nuisance claim, the *Maranatha* court concluded:

> Texas is a state where industry, and particularly energy-related industry, is openly abundant. If we were to allow a cause of action to persons who have not been harmed, in their land or body, by the lawful operation of an industry, but who are afraid that one day they will be, we would be opening our courts to a potential torrent of litigation. Persons who are apprehensive that one day in the future an industrial accident will harm them or their property could sue for their apprehension alone. Yet, doubtlessly, almost *every* Texas resident has experienced such apprehension at one time or another. For us to allow this cause of action would lead to a vast number of lawsuits—lawsuits not filed by persons who have actually been physically injured.

*Maranatha,* 893 S.W.2d at 100 (emphasis in original).

The Coopers contend *Maranatha* is not applicable because it involved captured petrochemicals and hydrocarbons in a man-made enclosure rather than a highly toxic and deadly gas that might become uncontrollable. We disagree. The uncontroverted evidence showed that even if the sour gas escaped the drilling process three miles underground, it would probably take it a full day to reach the surface. More

important, in *Maranatha* and the case before us, no physical injury occurred. In both, there was only a fear and apprehension of what might occur. Fear of the unknown is not a nuisance.

Citing *Nugent v. Pilgrim's Pride Corp.,* 30 S.W.3d 562, 575 (Tex.App.-Texarkana 2000, pet. denied), the Coopers argue that their claim for nuisance can be supported by a well-grounded fear or apprehension. In *Nugent,* the plaintiffs complained that their property had been damaged by successive overflows of chicken manure and other waste material onto their farm during the period beginning two years from the filing of their suit. *Id.* Further, there was evidence that the plaintiffs' health had been compromised by the presence of chicken manure on their land and by their breathing airborne particles from a feed mill operated by the defendants. *See id.* at 566, 575. Therefore, *Nugent* is distinguishable from the instant case. *Nugent* involved actual physical harm to the plaintiffs' property and person. Here, the Coopers allege that they were driven from their home by concerns about what the sour gas *might* do to them. As such, we conclude that *Nugent* is inapplicable to the facts of the case at hand.

The only evidence of a possible nuisance which caused the Coopers to leave their home was based on fear, apprehension, and other emotional reactions stemming from what they had been told by Mrs. Cooper's brother. Since no sour gas was ever encountered, no physical harm was shown by the Coopers. Therefore, we conclude that the Coopers presented no evidence which established a viable claim for nuisance. Consequently, based on the specific facts and circumstances in the instant case, and considering issues of public policy in *Maranatha* as set forth above, there was no evidence to support the submission of the Coopers' nuisance claim to

the jury. In so doing, the trial court abused its discretion. UPRC's third issue is sustained.[6]

Accordingly, we *reverse* the judgment of the trial court and *render* judgment that Coopers take nothing against UPRC.

---

**6.** Since our determination of UPRC's third issue is dispositive of the case, we need not address its other issues.