In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00183-CV
______________________________

RUSSELL BURKE AND WIFE, LORI BURKE, AND BOB
ANDERSON, AS CHAPTER 7 BANKRUPTCY TRUSTEE, Appellants
V.
UNION PACIFIC RESOURCES COMPANY, N/K/A ANADARKO
E&P COMPANY, PALESTINE WATER WELL SERVICE, INC. AND
JERE PRITCHETT, Appellees
 
 
UNION PACIFIC RESOURCES COMPANY, N/K/A ANADARKO
E&P COMPANY, Appellant
V.
RUSSELL BURKE AND WIFE, LORI BURKE, AND BOB
ANDERSON, AS CHAPTER 7 BANKRUPTCY TRUSTEE, 
PALESTINE WATER WELL SERVICE, INC. AND
JERE PRITCHETT, Appellees
                                              

On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. 99-493


                                                 

Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

            In the fall of 1997, Union Pacific Resources Company (UPRC) conducted a seismic survey
consisting of most of Rusk County. After the survey had been conducted, Russell and Lori Burke
noticed their recently drilled water well was producing an excessive amount of sand. The sand
caused decreased weight gain on their feedlot cattle and caused over 1,000 of the cattle to die. After
they were forced into bankruptcy, Russell and Lori Burke and Bob Anderson, the bankruptcy trustee
(herein collectively "the Burkes"), sued UPRC and Palestine Water Well Service, Inc. (PWW). After
a jury trial, the trial court rendered judgment against UPRC, awarding the Burkes $1.5 million and
awarding PWW $200,000.00. The Burkes appeal the judgment of the trial court, and UPRC cross-appeals. We render a take-nothing judgment concerning PWW's tortious interference claim and
suggest a remittitur concerning the Burkes' breach of contract claim.
            The Burkes raise the following three issues on appeal:
            1)        Where the evidence shows that the water well was eventually repaired and some water
service restored, was it error for the jury to find that the injury to the Burkes was permanent?

            2)        Where the expert only discovered that the seismic blasting damaged the well in
December 2001, was it error for the jury to find that the Burkes should have discovered it on January
1, 1998?

            3)        Where there was uncontroverted evidence concerning attorney's fees, was it error for
the jury to find that the Burkes were not entitled to recover attorney's fees?

Union Pacific Resources Company, n/k/a Anadarko E&P Company, presents eleven issues on
appeal. UPRC's issues are as follows:
            1)        Did the Burkes prove their right to recover from UPRC on a breach of contract theory
based on the testing permit (PX-17)?

            2)        Did the Burkes prove their right to recover from UPRC as purported third-party
beneficiaries of the indemnity contract (PX-99) between UPRC and Schlumberger?

            3)        Is there an adequate pleading by the Burkes to support recovery of consequential
damages?

            4)        Is there sufficient evidence of the Burkes' direct damages?

            5)        Is there sufficient evidence to support a total damage award of $1.5 million?
 
6)Is UPRC entitled to a credit for the Schlumberger settlement?

            7)        Does the two-year statute of limitations bar PWW's claims for tortious interference?

            8)        Does the lack of a pleading prevent PWW from recovering for tortious interference
with prospective relations?

            9)        Is there sufficient evidence to support either of PWW's claims for tortious
interference?

            10)      May PWW recover attorney's fees or expert witness fees as tort damages?
 
11)Is there sufficient evidence of malice by UPRC toward PWW?
Facts
            In the fall of 1997, the Burkes decided to open their own feedlot cattle preconditioning
operation. Russell Burke was familiar with the business, having worked with his father for many
years in a similar operation. Dr. Christopher Grotegut testified that he was familiar with Russell
Burke and his father and that they had been in the business a long time. The Burkes purchased
ninety-four acres in Laneville, Texas, and began to develop a preconditioning feedlot operation.
            Most cattle ranchers in this region of Texas have small operations. Due to their small size,
it is not always profitable to precondition calves. A feedlot cattle preconditioning operation obtains
calves from numerous operations and provides vaccinations and other care in a low stress
environment until the calves' immune systems are strong enough to fight diseases and stress on their
own. It is essential to a preconditioning operation that quality water be made available to nurture
the calves. Poor hydration will cause the cattle to have decreased appetites and result in reduced
weight gain. Proper hydration will decrease the frequency and effect of diseases. Poor hydration
will, however, prevent drugs from treating diseases as well as they should. The Burkes' operation
involved cattle that they owned outright, cattle that they partnered with others, and cattle that they
fed for customers. 
            In order to obtain an adequate water supply, the Burkes contracted with PWW to drill a water
irrigation well. PWW and the Burkes selected a location for the well based on PWW's knowledge
of the Laneville area and its sand formations. PWW started drilling the well on November 17, 1997,
and completed the well on November 21, 1997. While PWW was in the process of drilling the well,
it noticed some seismic testing operations approaching the area. 
            On September 22, 1997, the Burkes gave permission for seismic testing of their ninety-four
acres. Seismic testing is a method of exploring for hydrocarbons under the ground. Schlumberger
Technology Corporation (Schlumberger) performed the seismic testing on behalf of UPRC, which
involved thirty-six square miles and lasted several months. Seismic testing involves drilling a shot
hole, placing charges in the hole, and collecting readings of the waves created by the detonation of
the explosives. 
            Due to his previous oil field experience, Jere Pritchett, an employee of PWW, became
concerned about the effect of the seismic testing on the well. Pritchett stopped the drilling of the
well and informed the seismic crew about the well. Some of the seismic crew came to the well site
and discussed the situation with Pritchett. The Burkes did not want to stop drilling the well because
they had to get the feedlot operating in order to make payments on their obligations. Schlumberger
agreed to move their explosive charges away from the well so as not to damage it. 
            Schlumberger obtained an agreement from UPRC to pay for any damage to the well caused
by the seismic testing. Bennie Bates, the field project manager, signed the agreement on behalf of
UPRC. John Gibson, the project manager, testified he authorized Bates to execute the agreement. 
            When PWW finished the well, it produced clean water without any sand. The Burkes did
not install a pump until January 1998. After the well had been drilled, but before the pump was
installed, Schlumberger performed the blasting. After the blasting, the Burkes and Pritchett noticed
the well pad had been "uplifted" three to four inches above the ground. When the pump was
activated, there was sand in the water. The well eventually began producing parts of the gravel pack
intended to filter out the sand. This indicated that the gravel pack and screen had been broken. The
sand production became so bad that the 900-gallon holding tank and automatic watering troughs
would fill with sand. Sometimes the watering troughs needed to be cleaned out fifteen to twenty
times a day. The Burkes installed two sand separators in an attempt to filter out the sand. Initially,
Burke and PWW were unable to determine the cause of the problem.
            Eventually, the parties discovered that the seismic crews had detonated charges closer to the
well than discussed earlier and had increased the magnitude of the charges. Three of the charges had
been detonated in violation of the safe distance guidelines that UPRC had developed for another
project. 
            The cattle being raised by the Burkes had abnormally high rates of pneumonia and mortality. 
The cattle gained less weight than expected. Further, out of the first 500 cattle brought to the
operation, approximately 125 died. The Burkes brought in an expert to evaluate the operation, who
determined the only major problem with the operation was the sand in the water. The Burkes
repaired the well by having Travis Russell place a patch on the gravel pack. However, the repaired
well only produced approximately one half its original volume. On December 4, 2001, it was
discovered that UPRC had moved the holes closer to the well rather than farther away from it. 
            Out of the 14,000 cattle which had been conditioned by the operation, approximately 1,300
died. On average, a feedlot will have two percent of the calves die from natural causes. Dr. Grotegut
testified the Burkes' excessive losses were tied directly to the water problems. In an attempt to
maintain good relations with their customers, the Burkes replaced 500 of the cattle with their own
money. The Burkes sold their home and borrowed additional money for the replacements. Of the
cattle that survived, the Burkes had higher medical expenses and feed costs. The cattle ended up
with a weight gain of only 1.5 pounds per day, rather than the 2.5 pounds which the Burkes had
expected. Because the income from the feedlot was based on weight gain, the Burkes lost
approximately $25.00 per head on the surviving cattle. 
            Eventually, the Burkes declared bankruptcy. On December 29, 1999, the Burkes and the
bankruptcy trustee sued PWW for negligence, violations of the Texas Deceptive Trade Practices
Consumer Protection Act (DTPA), gross negligence, breach of contract, breach of implied
warranties, and violations of 16 Tex. Admin. Code Ann. § 76.705(a) (2003). On January 12, 2000,
the Burkes joined UPRC and Schlumberger, alleging negligence, gross negligence, breach of
contract, breach of implied warranty of merchantability, breach of implied warranty of fitness, and
DTPA violations. Schlumberger settled with the Burkes for $125,000.00. PWW filed a cross-action
against UPRC for tortious interference with an existing contract based on its conduct in blasting
within alleged unsafe distances of the well. 
            The jury found for the Burkes on the contract, third-party beneficiary, and negligence
theories. However, the jury found the Burkes were on notice of the damage to the well on January 1,
1998. The jury found that the Burkes had actual damages of $1.5 million and awarded $3 million
in punitive damages on the tort theory. The jury found PWW did not breach its contract with the
Burkes and awarded PWW $100,000.00 in actual damages and $100,000.00 in punitive damages for
its tortious interference with contractual relations suit against UPRC. The trial court rendered
judgment awarding the Burkes the $1.5 million and awarded PWW $200,000.00. Apparently, as a
result of the jury's finding on the issue that governed the date of the statute of limitations, the court
denied them all relief on the Burkes' tort theory, including the $3 million punitive award.
Summary
            We first determine whether the statute of limitations bars the Burkes' negligence claim. We
conclude that it does, since there is sufficient evidence to support the jury's findings that the injury
was permanent and that the discovery date of the injury should have been January 1, 1998. Next,
we address the sufficiency of the evidence of the Burkes' attorney's fees. Because error is not
preserved, we overrule this point of error. Then we determine whether the contract between the
Burkes and UPRC concerns activities which did not occur on the Burkes' land. We conclude that
the objective intent of the parties indicates the contract warranties cover those activities normally
defined as "seismic testing," which includes the generation of waves on a neighbor's property. We
then address whether the jury's award of $1.5 million is against the great weight and preponderance
of the evidence and whether UPRC was entitled to a settlement credit. We conclude the jury verdict
is against the great weight and preponderance of the evidence, and we suggest a remittitur. UPRC
is entitled to a settlement credit. The last issue concerns whether PWW's tortious interference claim
is barred by the statute of limitations. Because there is sufficient evidence to support the jury's
conclusion, we hold that PWW's tortious interference claim is barred.
Standards of Review
            The evidence is legally insufficient when (a) there is a complete absence of evidence of a
vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than
a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998). More than a scintilla of evidence
exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds
about the existence of a vital fact. Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,
77 S.W.3d 253, 262 (Tex. 2002). When deciding a no-evidence point, in determining whether there
is no evidence of probative force to support a jury's finding, we must consider all of the evidence in
the record in the light most favorable to the party in whose favor the verdict has been rendered, and
we must apply every reasonable inference that could be made from the evidence in that party's favor. 
Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). 
            If we find some probative evidence, we will test the factual sufficiency of that evidence by
examining the entire record to determine whether the finding is clearly wrong and unjust. When
considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and
weigh all of the evidence, not just that evidence which supports the verdict. Mar. Overseas Corp.
v. Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998). A court of appeals may set aside the verdict only if
it is so contrary to the great weight and preponderance of the evidence that the verdict is clearly
wrong and unjust. Id.; Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). The court of appeals is not
a fact-finder. Accordingly, the court of appeals may not pass on the witnesses' credibility or
substitute its judgment for that of the fact-finder, even if the evidence would clearly support a
different result. Ellis, 971 S.W.2d at 407. We do not pass on the credibility of the witnesses, and
we do not substitute our opinion for the trier of fact, even if there is conflicting evidence on which
a different conclusion could be supported. Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex.
App.—Dallas 1986, writ ref'd n.r.e.).
Permanent Injury
            In their first point of error, the Burkes argue that the evidence is factually and legally
insufficient to support the jury's finding that the injury to the water well was permanent in nature. 
The Burkes contend that temporary injuries are not restricted to only injuries caused by wind or rain
and that the injury was clearly temporary because it could be repaired. 
            UPRC responds that whether the injury is temporary or permanent is irrelevant because the
injury is not a continuing tort. The general rule in torts is that a cause of action accrues when the
wrongful act causes an injury. Dickson Constr., Inc. v. Fid. & Deposit Co. of Md., 960 S.W.2d 845,
851 (Tex. App.—Texarkana 1997, no pet.). One exception to the general rule is a continuing tort. 
Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp., 53 S.W.3d 799,
812 (Tex. App.—Austin 2001, pet. denied); First Gen. Realty Corp. v. Maryland Cas. Co., 981
S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied); Dickson Constr., Inc., 960 S.W.2d at 851. 
A cause of action for a continuing tort does not accrue until the defendant's tortious act ceases. First
Gen. Realty, 981 S.W.2d at 501.
            UPRC argues that the determination of whether the injury was temporary or permanent is
irrelevant because the tortious conduct was not repeated over time. A continuing tort occurs when
tortious conduct is repeated over time. Jim Arnold Corp. v. Bishop, 928 S.W.2d 761, 766 (Tex.
App.—Beaumont 1996, no pet.). Because the only tortious conduct committed by UPRC occurred
over two years ago, UPRC argues there is no continuing tort since the accumulation of damages does
not prevent the accrual of the cause of action. See First Gen. Realty, 981 S.W.2d at 501; cf. Murray
v. San Jacinto Agency, Inc., 800 S.W.2d 826, 828 (Tex. 1990). 
            However, only one of the cases cited by UPRC deals with injury to property. In First
General Realty, the Austin Court of Appeals applied this principle from cases not involving damage
to property.


 First General Realty, though, did not involve tortious conduct which caused damage
to property, but rather the failure to disclose that the property had a tendency to flood, which caused
damage to the property. First Gen. Realty, 981 S.W.2d at 501–02. 
            UPRC's argument fails because a finding of a continuing tort is not the only method to
postpone the accrual of the cause of action. Further, several courts of appeals have held the doctrine
of continuing torts does not apply to injury to property. The Fort Worth Court of Appeals has held
that the continuing tort doctrine does not apply to claims arising from permanent injury to land. 
Mitchell Energy Corp. v. Bartlett, 958 S.W.2d 430, 443 (Tex. App.—Fort Worth 1997, pet. denied);
Hues v. Warren Petroleum Co., 814 S.W.2d 526, 529 (Tex. App.—Houston [14th Dist.] 1991, writ
denied) ("continuing threat" barred by statute). The El Paso and Houston courts have agreed that the
doctrine of continuing torts does not apply to injury to property. Walton v. Phillips Petroleum Co.,
65 S.W.3d 262, 273 (Tex. App.—El Paso 2001, pet. denied); Loyd v. ECO Res., Inc., 956 S.W.2d
110, 127 (Tex. App.—Houston [14th Dist.] 1997, no pet.).
            The determination of the accrual date for damage to property depends on the characterization
of the injury as permanent or temporary. 
Permanent injuries to land give rise to a cause of action for permanent damages,
which are normally measured as the difference in the value of the property before and
after the injury. Temporary injuries give rise to temporary damages, which are the
amount of damages that accrued during the continuance of the injury covered by the
period for which the action is brought.

Bayouth v. Lion Oil Co., 671 S.W.2d 867, 868 (Tex. 1984). While a cause of action for a permanent
injury to land must be brought within two years, damages for temporary injuries may be recovered
for the two years before filing suit. Id. There are two major characteristics which courts examine
when determining whether an injury is permanent or temporary. The nature of the injury depends
on either the "continuum" of the injury and whether an injunction would abate the injury. 
            The first characteristic is the continuum of the injury. In Bayouth, the Texas Supreme Court
held that:
The character of an injury as either permanent or temporary is determined by
its continuum. Permanent injuries to land result from an activity of such a character
and existing under such circumstances that it will be presumed to continue
indefinitely; the injury must be constant and continuous, not occasional, intermittent
or recurrent. Temporary injuries, however, have been found where the injury is not
continuous, but is sporadic and contingent upon some irregular force such as rain. 
Kraft v. Langford, 565 S.W.2d 223 (Tex. 1978); Atlas Chemical Industries, Inc. v.
Anderson, supra at 685.
Bayouth, 671 S.W.2d at 868–69. 
            The second characteristic is whether an injunction would abate the injury. The Texas
Supreme Court has recognized that the ability to enjoin successfully the activity or condition causing
the damage indicates that the injury could be temporary. Neely v. Cmty. Prop., Inc., 639 S.W.2d 452,
454 (Tex. 1982); Kraft v. Langford, 565 S.W.2d 223 (Tex. 1978); see Bates v. Schneider Nat'l
Carriers, Inc., 95 S.W.3d 309, 314 (Tex. App.—Houston [1st Dist.] 2002, pet. granted); Nugent v.
Pilgrim's Pride Corp., 30 S.W.3d 562, 567 (Tex. App.—Texarkana 2000, pet. denied). The Burkes
argue that, because the well can be repaired, the injury is temporary. They do not argue that an
injunction would solve the problem, but rather that the problem can be abated. The Tenth Circuit
has observed that, if an injury is abatable or remediable, courts generally characterize it as temporary. 
Miller v. Cudahy, 858 F.2d 1449, 1454 (10th Cir. 1988) (recognizing the confused state of the law). 
At least one Texas case appears to support that, if an injury can be abated, it is temporary. In Crown
Central Petroleum Corp. v. Coastal Transport Co., the Fourteenth Court of Appeals held that injury
to a loading facility was temporary because the facility could be rebuilt. Crown Cent. Petroleum
Corp. v. Coastal Transport Co., 38 S.W.3d 180 (Tex. App.—Houston [14th Dist.] 2001, pets.
granted) (loading facility burned after the engine running on one truck ignited gasoline vapors that
spilled from a second truck). While the ability to abate an injury with an injunction is a
characteristic of a temporary injury, the unavailability of an injunction does not require a finding of
a permanent injury. City of Odessa v. Bell, 787 S.W.2d 525, 530 (Tex. App.—El Paso 1990, no
writ). 
            Sufficient evidence exists to support the jury's conclusions. The question of whether injury
to property is permanent or temporary is a question of fact for the jury. Trinity & S. Ry. Co. v.
Schofield, 72 Tex. 496, 10 S.W. 575, 577 (1889); Hood v. Adams, 334 S.W.2d 206, 208 (Tex. Civ.
App.—Amarillo 1960, no writ); see Bayouth, 671 S.W.2d at 868. Under the continuum test, there
is ample evidence to support a finding of permanent injury. The blasting, a one-time event, caused
the damage to the well. The damage, although increasing over time, did not occur sporadically or
irregularly. The evidence at trial established that the sand was constantly present in the water. The
only evidence of irregular forces involved the greater demand for water during hot weather. Thus,
the finding of a permanent injury is not so contrary to the great weight and preponderance of the
evidence as to be clearly wrong and unjust. 
Discovery Date of the Burkes' Injury
            The Burkes contend the jury's finding that they knew or should have known of the injury on
January 1, 1998, is against the great weight and preponderance of the evidence. Because the parties
did not confirm the cause of the injury until they discovered the location of the shot holes on
December 4, 2001, the Burkes argue that the jury's conclusion is factually insufficient.
            UPRC's first counter-argument is that the error was not preserved. UPRC argues that the
Burkes' failure to file a motion for new trial resulted in the error, if any, not being preserved. A
factual sufficiency point of error must be preserved with a motion for new trial. Tex. R. Civ. P.
324(b). However, the Burkes did file a pleading entitled "Motion for Judgment and Judgment
Notwithstanding the Verdict." In this motion, the Burkes argued that the jury's finding on this issue
was against the great weight and preponderance of the evidence and requested "all relief consistent
with this motion." A motion should be construed by its substance to determine the relief sought, not
merely by its form or caption. See Surgitek, Bristol-Myers Corp. v. Abel, 997 S.W.2d 598, 601 (Tex.
1999). Based on its substance, the motion preserved error by arguing that the jury's finding was
against the great weight and preponderance of the evidence.
            UPRC argues that the discovery rule should not apply because the injury is not inherently
undiscoverable and objectively verifiable. However, none of the cases cited by UPRC deal with
injury to property.


 In actions for damage to property, Texas courts have consistently applied the
discovery rule. Bayouth, 671 S.W.2d at 868; Hues, 814 S.W.2d at 529; cf. W.W. Laubach Trust/
Georgetown Corp. v. Georgetown Corp./W.W. Laubach Trust, 80 S.W.3d 149, 159 (Tex.
App.—Austin 2002, pet. denied). The discovery rule, when it applies, tolls the running of limitations
and is an exception to the legal injury rule. See S.V. v. R.V., 933 S.W.2d 1, 14 (Tex. 1996). UPRC's
argument fails because the discovery rule has clearly been applied to cases involving injury to
property.
            The Burkes contend that the cause of action does not arise until the cause of the injury is
discovered. However, this argument fails because the cause of action accrues on discovery of the
injury. "An action for permanent damages to land accrues, for limitation purposes, upon discovery
of the first actionable injury and not on the date when the extent of the damages to the land are fully
ascertainable." Bayouth, 671 S.W.2d at 868; Nugent, 30 S.W.3d at 567–68. 
            Several Texas courts of appeals have specifically rejected the contention that the cause of
action does not accrue until the cause of the injury to the property is discovered.


 The Tyler Court
of Appeals differentiated the discovery rule applicable in medical malpractice cases in rejecting the
argument that the cause of action fails to accrue until discovery of the cause of the injury to the
property. See Yancy v. City of Tyler, 836 S.W.2d 337, 339 (Tex. App.—Tyler 1992, writ denied). 
In Bartlett, the Fort Worth Court of Appeals held that the trial court erred in instructing the jury that
injury is not discovered until the plaintiff knows or should have known the cause of the injury to the
property. Bartlett, 958 S.W.2d at 437. Citing the Bartlett decision, the El Paso court held similarly
in dicta. Walton, 65 S.W.3d at 271. Absent a compelling reason to decide otherwise, we will follow
our sister courts' reasoning.
            The jury's finding of January 1, 1998, as the discovery date of the injury is not so contrary
to the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. 
The cause of action for injury to property accrues when the injury is discovered. UPRC argues that
the evidence establishes the pump was installed on December 16, 1997. During trial, Pritchett
testified the pump was installed after "some time lapse," which would have been around January
1998. However, on cross-examination, UPRC pointed out Pritchett had previously testified by
deposition that he had installed the pump on December 16, 1997. Lori Burke testified they
discovered sand in the well when the pump was installed around the "First of January." There is
some evidence that the Burkes suspected the blasting may have been the cause of the injury at this
time. Pritchett had filed an affidavit earlier in the case in which he stated that Russell Burke accused
the seismograph survey of "tearing up" the well when the pump was installed. The finding of
January 1, 1998, is not so contrary to the great weight and preponderance of the evidence as to be
clearly wrong and unjust. Since the discovery date is factually sufficient, we will not address
UPRC's remaining counter-arguments concerning the negligence claim. Because the Burkes'
negligence claim was filed against UPRC more than two years after the accrual of that cause of
action, it is barred by the statute of limitations. See Tex. Civ. Prac. & Rem. Code Ann. § 16.003
(Vernon 2002).
The Burkes' Attorney's Fees
            The Burkes argue that the award of zero dollars in attorney's fees is against the great weight
and preponderance of the evidence. UPRC argues the Burkes failed to preserve error, if any. No
motion for new trial was filed concerning the issue of attorney's fees. A motion for new trial must
be filed in order to preserve a factual sufficiency review. Tex. R. Civ. P. 324(b). The Burkes have
failed to preserve error concerning the issue of attorney's fees. Breach of Contract Theory
            In its first point of error, UPRC argues that the Burkes do not have a cause of action for
breach of contract. UPRC argues that the agreement only contains two promises by UPRC to the
Burkes. According to UPRC, the contract only requires it to pay ten dollars per acre for surface
access to conduct the operation and to pay for claims or damages arising from any testing done on
the Burkes' own land. The dispute concerning the contract issue revolves around whether the
contract term "seismic testing" is limited to testing done on the Burkes' land or whether it includes
UPRC's actions in conducting the survey, which included the Burkes' land. We conclude that the
contract includes more than merely surface activity.
            UPRC argues that there is no evidence that any seismic work on the Burkes' land affected or
even approached the water well. Instead, the focus of the trial was on a line of shot holes across the
road on a neighbor's property. These holes were just across the property line and relatively close to
the Burkes' water well. UPRC contends these activities are not covered by the contract because they
were not conducted on the Burkes' land.
            In response to Question 1, the jury found UPRC failed to comply with the agreement with
the Burkes. Question Number 1 asked:
Did Union Pacific Resources Company fail to comply with the agreement
dated September 22, 1997 between itself and the Burkes?
 
Answer "Yes" or "No".
 
Answer: Yes 

The agreement in question, which UPRC refers to as the "testing agreement," provides specifically:
We respectfully request permission to conduct a Seismograph survey across surface
and or mineral property(s) owned and/or leased by you as defined according to the
following legal description;
 
                        . . . .
 
Our operations will be conducted in accordance with standard Geophysical practices
and in a prudent and careful manner, and we agree to hold you free and harmless
from any and all claims and damages that may result from our work by virtue of your
permission herein granted, including all land owned or claimed by lessor adjacent or
contiguous to the land particularly described above, whether the same be in said
survey or surveys or in adjacent surveys although not included within the boundaries
of the land particularly described above.

            When interpreting contracts, the primary concern of this Court is to give effect to the parties'
intentions as expressed in the contract. CMS Partners, Ltd. v. Plumrose USA, Inc., 101 S.W.3d 730,
732 (Tex. App.—Texarkana 2003, no pet.). In determining the parties' intentions, intent must be
taken from the agreement itself, not from the parties' present interpretation. Id. The agreement will
be enforced as created regardless of whether the parties contracted wisely. Id. 
            UPRC urges this Court to adopt a construction of this agreement which would only produce
liability for the testing actually done on the Burkes' land. Under this construction, the contract
exposes UPRC to liability only for damage caused by testing done on the Burkes' land, not for testing
done on a neighbor's land. UPRC contends the contract is limited to work being done "by virtue of
your permission herein granted." The "hold harmless" clause includes the clarification "including
all land owned or claimed by lessor . . . ." Further, the clause refers to "property described
hereinabove," i.e., the Burkes' ninety-four-acre tract. While the "hold harmless" clause refers only
to operations occurring on the Burkes' land, we disagree that the objective intent of the entire
agreement does not apply to work done on someone else's land.
            The contract, as a whole, is not limited to surface activities on the Burkes' land. The contract
includes UPRC's actions in conducting the survey, which involves the Burkes' land. The contract
is a form contract clearly developed for both mineral and surface owners. There are several blanks
and boxes intended to designate whether permission is being obtained from a surface owner or a
mineral owner. Although the "hold harmless" clause may be limited to the Burkes' land, it is only
one clause in the contract. The objective intent of the parties was to require that the seismic testing
be conducted in a safe and prudent manner. This interpretation is reasonable because there are many
reasons UPRC would seek permission to conduct the seismic survey and would be willing to make
this promise to obtain the said permission.
            UPRC's argument fails because the objective intent of the standard practices clause is not
confined to activities on the Burkes' land. The contract as a whole applies to the survey, rather than
activities on the Burkes' land. The permit, the contract at issue, involves granting of permission by
the Burkes to UPRC to conduct a "seismic survey" across the Burkes' land. Courts should give terms
their plain, ordinary, and generally accepted meaning unless the contract indicates otherwise. 
Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). Technical words and terms
in a contract are to be construed by the courts as those terms are usually understood by persons in
the profession or business to which the terms relate, unless it is clear that the terms were used in a
different sense. Oil Ins. Ass'n v. Royal Indem. Co., 519 S.W.2d 148, 150 (Tex. Civ. App.—Houston
[14th Dist.] 1975, writ ref'd n.r.e.); Frost v. Martin, 203 S.W. 72, 74 (Tex. Civ. App.—Fort Worth
1918, no writ). The United States Department of Agriculture pamphlet on geophysical operations,
which was introduced into evidence, defines seismic testing as a method of exploring for
hydrocarbons under the ground. Seismic testing relies on the mathematical analysis of various
echoes or reflective waves that are generated when an explosive charge is detonated at the bottom
of a deep hole. Thus, seismic testing involves more than mere surface activity. It involves surface
activities such as detonation of explosives and the drilling of holes, as well as the waves generated
by the explosions and the analysis of these waves. We conclude that the phrase "seismic testing" in
the contract includes generating reflective underground waves.
            The Burkes argued on appeal and at trial that UPRC is liable because it did not conform to
the "standard Geophysical practices" or conduct the blasting "in a prudent and careful manner." 
Although the standard practices clause is in the same sentence as the hold harmless clause, they are
contained in independent clauses. An independent clause can stand alone as a sentence. William
Strunk, Jr. & E. B. White, The Elements of Style, p. 5 (4th ed. 2000). The qualifying language
that may limit the hold harmless clause to activities on the Burkes' land does not apply to the
standard practices clause. Therefore, the standard practices clause applies to the "seismic survey,"
which includes subsurface activities such as the generation and measurement of the waves. 
            The standard practices clause creates an express warranty guaranteeing that UPRC's actions
and the actions of its agents will be "conducted in accordance with standard Geophysical practices
and in a prudent and careful manner." The Burkes presented ample evidence that UPRC's activities
were not conducted in a "prudent and careful manner" and some evidence that they were not
conducted in accordance with "standard Geophysical practices." Therefore, the Burkes did have a
cause of action for breach of the contract.
Third-Party Beneficiary Theory
            At the end of trial, the Burkes requested a trial amendment to add a cause of action based on
being a third-party beneficiary to a contract between UPRC and Schlumberger's Geco-Prakla
division. The Burkes argue they are third-party beneficiaries because the contract clearly intends to
secure payment of damages to the Burkes' well. UPRC responds the agreement is merely an
indemnity agreement between it and Schlumberger.
            There is a presumption against, not in favor of, third-party beneficiary agreements. MCI
Telecomm. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); Carson Energy, Inc. v.
Riverway Bank, 100 S.W.3d 591, 600 (Tex. App.—Texarkana 2003, pet. denied). Absent clear
indication in the contract that the parties intended to confer a direct benefit to the third party, the
third party may not maintain an action as a third-party beneficiary. MCI Telecomm. Corp., 995
S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley v. Lano Int'l, Inc., 569 S.W.2d 602,
603 (Tex. Civ. App.—Texarkana 1978, writ ref'd n.r.e.). A third party may recover on a contract
made by other parties only if the parties intended to secure some benefit to that third party and only
if the parties entered into the contract directly for the third party's benefit. MCI Telecomm. Corp.,
995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603.
            To qualify as one for whose benefit the contract was made, the third party must show he or
she is either a donee or creditor beneficiary of the contract, i.e., not one who is benefitted only
incidentally. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600;
Hurley, 569 S.W.2d at 603. One is a donee beneficiary if the performance promised will, when
rendered, come to him or her as a pure donation. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson
Energy, Inc., 100 S.W.3d at 600. If, on the other hand, that performance will come to him or her in
satisfaction of a legal duty owed to him or her by the promisee, he or she is a creditor beneficiary. 
MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600. The duty to
creditor beneficiaries may be an "indebtedness, contractual obligation or other legally enforceable
commitment" owed to the third party. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy,
Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603. In determining whether a third party can
enforce a contract, the intention of the contracting parties is controlling. A court will not create a
third-party beneficiary contract by implication. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson
Energy, Inc., 100 S.W.3d at 600. The intention to contract or confer a direct benefit to a third party
must be clearly and fully spelled out, or enforcement by the third party must be denied. MCI
Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d
at 603. Consequently, a presumption exists that parties contracted for themselves unless it "clearly
appears" they intended a third party to benefit from the contract. MCI Telecomm. Corp., 995 S.W.2d
at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603.
 
            In the case at bar, the contract was formed between Schlumberger's Geco-Prakla division and
UPRC. The Burkes do not argue they were a party to the contract. The contract provides:
U.P.R.C. has agreed to the following distances and charge sizes in the vicinity of a
new water well that was drilled after the shot points were drilled. This water well is
situated on the North side of highway 1798 and between receiver lines 412 and 424. 
This well was drilled to service a new cattle feedlot. It was drilled to a depth of 600'
and cased with PVC casing. Geco-Prakla understands that U.P.R.C assumes all
responsibility for any damages or costs to this water well resulting from Shot Points
shot in the vicinity's [sic] as listed below:

                        . . . .

                                                            Agreed and accepted on Nov. 23, 1997.
                                                            by /s/ B.D. Bates 

There is no language in the contract indicating the contract was for the benefit of the Burkes. An
indemnity agreement does not create third-party beneficiary status unless the third party is a creditor
beneficiary and the contract was formed for his or her benefit. MCI Telecomm. Corp., 995 S.W.2d
at 651; Hurley, 569 S.W.2d at 603. The agreement simply does not support a claim of third-party
beneficiary for the Burkes. Without privity of contract or a clear indication the Burkes were
third-party beneficiaries, the Burkes cannot recover on this contract.
The Burkes' Pleadings
            In its third point of error, UPRC argues that the pleadings were insufficient as to the damages
to the dead cattle and weight loss to the cattle. Because the Burkes did not include the deceased
cattle and the decreased weight loss to the cattle as damages in their petition, UPRC argues these
damages cannot be awarded.
            The Burkes contend the damages due to the dead cattle and decreased weight gain are direct
damages rather than special damages. The case cited by the Burkes, i.e., Humble Pipe Line Co. v.
Day, 172 S.W.2d 356, 358 (Tex. Civ. App.—Waco 1943, writ ref'd w.o.m.), did involve both dead
cattle and weight loss to the cattle. However, the discussion of special damages is limited to the
decrease in market value of the land. In Day, a landowner brought suit for damage to her land and
cattle caused by large quantities of crude oil which escaped from a nearby pipeline and settled in and
near a creek running through her farm. Id. Humble argued that the decreased value of the land was
a special damage, and the court held that the damage to the land was a direct damage because it was
reasonably foreseeable. Id. Day does not stand for the proposition that the dead cattle and weight
loss were direct damages, although the court did allow Day to recover for the dead cattle and weight
loss. 
            Our analysis is that the dead cattle and the decreased weight gain of the surviving cattle are
special damages rather than direct or general damages. Direct damages "flow naturally and
necessarily" from the wrong and "compensate the plaintiff for the loss that is conclusively presumed
to have been foreseen by the defendant from his wrongful act." Arthur Andersen & Co. v. Perry
Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997). "Special damages are those that proximately result
from the defendant's wrongful conduct but are of such an unusual nature that they would normally
vary with the circumstances of the individual case in which they occur." Sherrod v. Bailey, 580
S.W.2d 24, 28 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). Special damages are
those damages "which result naturally, but not necessarily, from the acts complained of." Henry S.
Miller Co. v. Bynum, 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, J., concurring); see Arthur
Andersen & Co., 945 S.W.2d at 816. 
            The death of cattle and the losses incurred due to the decreased weight gain do not
necessarily flow from damage to a water well. They are damages which will normally vary with the
circumstances of each case. The damages resulted from the sand, which caused the calves stress and
increased their susceptibility to illnesses. The damages did not naturally and necessarily flow from
the damage to the well. Further, the losses due to decreased weight gain are analogous to lost profits,
which have consistently been held to be special damages in Texas. See Naegeli Transp. v. Gulf
Electroquip, Inc., 853 S.W.2d 737, 739 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Our
conclusion is that the damages due to the dead cattle and the decreased weight gain of the cattle are
special damages.
            Under the common law, "special damages" are not recoverable unless the defendant had
notice that the plaintiff would suffer such damages. Id. "When items of special damage are claimed,
they shall be specifically stated." Tex. R. Civ. P. 56. In order to be recoverable, special damages
must be pled. Lesikar v. Rappeport, 33 S.W.3d 282, 306 n.1 (Tex. App.—Texarkana 2000, pet.
denied); see Bynum, 836 S.W.2d at 163 (Phillips, J., concurring). 
            Before our analysis progresses any further, we must determine whether error was preserved. 
Rule 90 of the Texas Rules of Civil Procedure requires that any defect "either of form or of
substance" must be "pointed out by exception in writing" and brought to the attention of the trial
court. Tex. R. Civ. P. 90. UPRC did not specially except to the pleadings or object to the
introduction of evidence concerning the special damages. However, UPRC did object to the
submission of the damage question to the jury on the basis that the damages resulting from the dead
cattle and the decreased weight gain of the cattle were not "supported by Plaintiffs' general
pleadings." Because UPRC objected to the submission of the issue to the jury, the issue was not
tried by consent. See Tex. R. Civ. P. 67; see also Matthews v. Gen. Accident Fire & Life Assurance
Corp., 161 Tex. 622, 343 S.W.2d 251, 255 (1961); Harkey v. Tex. Employers' Ins. Ass'n, 146 Tex.
504, 208 S.W.2d 919, 923 (1948). Therefore, error was preserved for our review.
            The trial court, though, did not abuse its discretion in submitting the question concerning
damages to the jury. In order to warrant submission to the jury, the issues must be raised by both
the pleadings and the evidence. Tex. R. Civ. P. 278; City of Princeton v. Abbott, 792 S.W.2d 161,
167 (Tex. App.—Dallas 1990, writ denied). The sufficiency of the pleadings is judged based on
whether they provide the opponent with fair and adequate notice. Roark v. Allen, 633 S.W.2d 804,
809–10 (Tex. 1982); Howell v. Mauzy, 899 S.W.2d 690, 707 (Tex. App.—Austin 1994, writ denied). 
The purpose of this rule is to allow an opposing party to adequately prepare for trial. Roark, 633
S.W.2d at 810. "Fair notice" requires that "an opposing attorney of reasonable competence" can
ascertain the nature and basic issues of the controversy. City of Alamo v. Casas, 960 S.W.2d 240,
251 (Tex. App.—Corpus Christi 1997, pet. denied). In order for the pleadings to be sufficient, the
defendants must have fair notice of the special damages being asserted. See Sherrod, 580 S.W.2d
at 28 (holding that defendants did not have fair notice that "damages to the improvements" were
being sought). 
            The Burkes argue that the DTPA demand letter, which was attached to the pleadings, is
sufficient to meet the pleading requirement. A party may attach and incorporate into its pleadings
written instruments "constituting, in whole or in part, the claim sued on, or the matter set up in
defense." Tex. R. Civ. P. 59. UPRC contends that the demand letter cannot be incorporated into
the pleadings because it does not constitute the claim sued on. The notice requirement of the DTPA
must be pled. Hines v. Hash, 843 S.W.2d 464, 467 (Tex. 1992). Because notice must be pled in a
DTPA action, we conclude that notice under the DTPA forms part of the DTPA claim or a matter
concerning a defense. See Houston Cmty. Coll. Sys. v. Schneider, 67 S.W.3d 241, 242–43 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied) (copies of worker's compensation proceedings
incorporated into the pleadings); Skepnek v. Mynatt, 8 S.W.3d 377 (Tex. App.—El Paso 1999, pet.
denied) (attached affidavit in support of special appearance deemed incorporated). Therefore, the
DTPA demand letter was incorporated as part of the Burkes' DTPA claim against PWW. The
remaining issue is whether the enumeration of special damages in the DTPA claim is sufficient to
plead those special damages against another defendant, specifically UPRC, in a different cause of
action, specifically breach of contract.
            The incorporation of the DTPA demand letter provided UPRC with fair notice of the special
damages. In the attached letter, the Burkes listed the following damages: "the Burkes waited over
a year without potable water and suffered a loss of use of their residence, expenses in transporting
cattle, weight loss on cattle, and death of cattle . . . ." In their petition, the Burkes alleged:
The damages suffered by Plaintiffs in connection with the Defendants'
improper, wrongful, and/or negligent conduct in this case are in excess of the
minimum jurisdictional limits of this Court. At this point in time, Plaintiffs' damages
are in an amount not less than $204,321.50; however, Plaintiffs expressly and
specifically reserve the right to amend and/or supplement the aforementioned
damages figure as this litigation progresses.

This is the only paragraph in the petition other than the attachment which addresses the Burkes'
damages. The petition clearly indicates that the same damages are being brought against all
defendants. The Burkes use the plural form of "defendants," indicating that the paragraph is referring
to multiple defendants. Further, it is clear that all of the injuries came from the same injury, i.e., the
sand in the well. When there are no special exceptions, a petition will be construed liberally in favor
of the pleader. Roark, 633 S.W.2d at 810. Since the petition alleges the same damage amount
against all defendants, any attorney of reasonable competence would have fair notice that the special
damages enumerated in the attached DTPA letter are being asserted against all the defendants. 
            UPRC cites Employers Casualty Co. v. Transport Insurance Co. for the proposition that the
attachment does not provide fair notice. Employers Cas. Co. v. Transport Ins. Co., 444 S.W.2d 606,
610 (Tex. 1969). Employers Casualty, though, held that neither the pleading nor the attachment gave
fair notice that the plaintiff was seeking "recovery in subrogation." Employers Cas. Co., 444 S.W.2d
at 610. In this case, the attachment does provide fair notice that special damages for the dead cattle
and the decreased weight gain of the cattle were being sought. Further, the depositions of Russell
and Lori Burke indicate that UPRC was well aware that the Burkes were seeking damages for the
dead cattle and the decreased weight gain of the surviving cattle.
            In this case, the pleading against PWW, which specifically pled the special damages,
provided fair notice to UPRC that the same special damages would be asserted against them. We
are not holding that special damages pled against one defendant will always be sufficient against
other defendants. However, in this case, the pleading gave fair notice of the special damages to
UPRC. Because we are to liberally construe pleadings in favor of the pleader in absence of any
written special exceptions, the pleadings did specifically plead the special damages.



Sufficiency of the Evidence of the Damages
            In its points of error four and five, UPRC argues there is insufficient evidence of the actual
damages. The jury awarded the Burkes $1.5 million in actual damages. Question B asked the jury:
What sum of money, if paid now in cash, would fairly and reasonably
compensate Burkes for their damages, if any, resulting from the occurrence in
question?

                        . . . . 
 
Consider the following elements of damages and none other:
a.losses incurred on weight gain of cattle that were a natural, probable,
and foreseeable consequence of Union Pacific Resources failure to
comply
b.losses incurred on dead cattle that were a natural, probable, and
foreseeable consequence of Union Pacific Resources failure to
comply
c.reasonable and necessary cost incurred in repairing the water well in
question

At trial, the Burkes' counsel requested $700,000.00 for the decreased weight gain, $400,000.00 for
the dead cattle, and $7,600.00 for the well repair. The Burkes did not request damages related to
increased veterinary expenses. In total, the Burkes requested that the jury award $1,107,600.00 in
actual damages. The jury awarded $1.5 million. 
            UPRC argues there is no evidence of "reasonable and necessary" costs to repair the well. 
UPRC asks us to "delete" and "overturn" the damage finding of $1.5 million. UPRC also alleges the
award was excessive and not supported by the evidence. These allegations challenge both the legal
and factual sufficiency of the evidence. UPRC preserved the error for both the legal and factual
sufficiency reviews. In its motion for judgment notwithstanding the verdict, it argued there was no
evidence of the damages and objected to the submission of the jury question on the basis that there
was no evidence. UPRC argued in its motion for new trial that the damages were excessive. 
            On appeal, the Burkes argue that the damage award can be supported by the evidence. The
evidence was that the Burkes processed 14,000 cattle in the operation. We understand the Burkes'
argument concerning damages as follows: 
            Weight Gain:                                      14,000 x $50.00 = $700,000
            Veterinary Expenses (Weight Gain): 14,000 x $40.00 = $560,000
            Dead Cattle:                                        500 replaced cattle x $500 = $250,000
            Well Repair:                                       $7,800
                                                                        $1,617,800

Thus, the Burkes argue the jury could have awarded a total of $1,617,800.00. We note the Burkes
are not contending the jury could have awarded damages for dead cattle which the Burkes did not
replace. Lori Burke testified that 1,200 to 1,300 cattle died. Of the dead cattle, the Burkes replaced
approximately 500. It is unclear as to the ownership of the remaining 800 dead cattle. It appears that
some of the cattle were owned in some form of partnership.
            On appeal, the Burkes argue that the jury's award is supported by the evidence because of the
increased cost of veterinary care caused by the sand in the water. We disagree that the veterinary
expenses can be awarded as part of the loss due to the decreased weight gain element of damage. 
The Burkes contend that the veterinary expenses are related to decreased weight gain of the cattle. 
Our conclusion is that the veterinary expenses are too dissimilar from the decreased weight gain to
be awarded under that element. No question was submitted to the jury concerning the increased
veterinary expenses. Because the veterinary expenses are not attributable to "losses incurred on
weight gain" of the cattle, they cannot be used to support the award.
            In addition, the amount of the increased veterinary costs argued by the Burkes is unsound. 
The forty-dollar figure asserted by the Burkes referred to testimony that, when a calf died, the calf
that replaced it would then have to be vaccinated. This resulted in an increased cost of forty dollars
per head rather than twenty dollars per head. The testimony pertained only to the replaced cattle. 
Thus, this evidence provides evidence of damages in the amount of $10,000.00 (500 replaced cattle
x ($40.00–$20.00)), rather than $560,000.00. The veterinarian testified that vaccination costs were
increased by the lack of water, because the medicines would not perform as well when cattle were
dehydrated. The Burkes have not shown where evidence of these increases can be found in the
record. Further, as discussed above, the Burkes did not submit a question concerning veterinary
expenses.
            The remaining damages asserted by the Burkes are supported by the evidence. As a result
of the problems with sand in the well, Lori Burke testified their cost to increase a calf's weight was
much greater than the average cost. On average, the calves in their operations gained only one and
a half pounds per day instead of the expected two and a half pounds. In total, the decreased weight
gain resulted in a loss of twenty-five dollars per head per month. Since each calf stayed at the feedlot
an average of two months, the Burkes lost fifty dollars per head. The Burkes replaced approximately
500 head of the dead cattle for their customers. Lori Burke testified that the cattle were selling on
average between $400.00 and $500.00 per head. Russell testified that it cost $7,800.00 to repair the
well. Thus, the maximum amount supported by the evidence is as follows:
            Decreased Weight Gain - 14,000 head x $50/per head                       $ 700,000
            Dead Cattle: 
                        Replaced Cattle - 500 head x $500/per head                          $ 250,000
            Well Repair -  7,800                                                                           $ 7,800
$ 957,800

These calculations assume that cattle were selling at the maximum price of $500.00 per head. Thus,
the jury's award of $1.5 million is so contrary to the great weight and preponderance of the evidence
as to be clearly wrong and manifestly unjust. 
Settlement Credit
            UPRC argues it is entitled to credit for the Schlumberger settlement. The Burkes and PWW
settled with Schlumberger before trial for $125,000.00. Of this amount, $13,500.00 was awarded
to PWW. UPRC argues it is entitled to a settlement credit under the one satisfaction rule. The
Burkes contend the Schlumberger settlement could have been attributable to damages other than
those asserted against UPRC.
            When a single, indivisible injury occurs, the plaintiff may recover only once for that injury. 
See Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 8 (Tex. 1991); Facciolla v. Linbeck Constr.
Corp., 968 S.W.2d 435, 449 (Tex. App.—Texarkana 1998, no pet.). The party seeking a settlement
credit has the burden to prove its right to such a credit. Mobil Oil Corp. v. Ellender, 968 S.W.2d
917, 927 (Tex. 1998); Cohen v. Arthur Andersen, L.L.P., 106 S.W.3d 304, 310 (Tex. App.—Houston
[1st Dist.] 2003, no pet.). The party must prove the settlement amount and introduce in the record
either the settlement agreement or some evidence of the settlement amount. Ellender, 968 S.W.2d
at 927; Cohen, 106 S.W.3d at 310. "If the nonsettling party meets this burden, the burden shifts to
the plaintiff to tender a valid settlement agreement allocating the settlement between (1) damages
for which the settling and nonsettling defendant [sic] are jointly liable, and (2) damages for which
only the settling party was liable." Cohen, 106 S.W.3d at 310; see Crown Life Ins. Co. v. Casteel,
22 S.W.3d 378, 391–92 (Tex. 2000). The plaintiff is in the better position to prove the proper
allocation of the settlement. Ellender, 968 S.W.2d at 928. If the plaintiff fails to satisfy this burden,
then the nonsettling party is entitled to a credit equaling the entire settlement amount. Cohen, 106
S.W.3d at 310; see Ellender, 968 S.W.2d at 928.
            UPRC introduced the settlement agreement into the record. Therefore, the burden shifted
to the Burkes to prove the damages for which only the settling party was liable. On appeal, the
Burkes argue that the Schlumberger settlement can be attributed to damages for loss of the use of
their residence and additional costs in transporting cattle. Although pled in their eighth amended
petition, neither of these damages was submitted to the jury. However, the record does not indicate
the Burkes made this argument to the trial court. The Burkes argued to the trial court that UPRC was
responsible for proving the proper allocation of the settlement. Because the Burkes failed to meet
their burden of proving the damages solely attributable to Schlumberger, the full amount of the
settlement should be credited toward the judgment. The award should be reduced by $111,500.00.
PWW's Tortious Interference Claim
            UPRC contends in its seventh point of error that PWW's tortious interference with
contractual relations claim is barred by the statute of limitations. UPRC argues that the discovery
rule does not apply to claims of tortious interference as a matter of law because these types of
injuries are neither inherently undiscoverable nor objectively verifiable. This Court has noted that
the discovery rule is a "very limited exception" to the statute of limitations. Schindley, 13 S.W.3d
at 67. The discovery rule only applies when the nature of the plaintiff's injury is both inherently
undiscoverable and objectively verifiable. Altai, Inc., 918 S.W.2d at 456. As discussed below, there
is sufficient evidence to support the jury's finding as to the discovery date of the injury. For purposes
of this discussion, we will assume that the discovery rule applies.
            PWW argues that tortious interference should be governed under the residual statute of
limitations, Section 16.051, instead of Section 16.003. Section 16.051 provides that "[e]very action
for which there is no express limitations period, except an action for the recovery of real property,
must be brought not later than four years after the day the cause of action accrues." Tex. Civ. Prac.
& Rem. Code Ann. § 16.051 (Vernon 1997). In Dickson Construction, Inc., this Court noted that
the Texas Supreme Court may have erred in First National Bank of Eagle Pass v. Levine. Dickson
Constr., Inc., 960 S.W.2d at 849; see First Nat'l Bank of Eagle Pass v. Levine, 721 S.W.2d 287, 289
(Tex. 1986) (holding that tortious interference with business relations was within the meaning of
trespass in Section 16.003). In our opinion, we criticized the Texas Supreme Court's interpretation
of the statute to require a tortious interference cause of action to be brought within two years. 
Dickson Constr., Inc., 960 S.W.2d at 849. As we held in Dickson Construction, we adhere to the
application of Section 16.003 to tortious interference claims until the Texas Supreme Court changes
its interpretation. 
            Even assuming the discovery rule applies, there is sufficient evidence to support the jury's
answer concerning the discovery date of the injury. The jury found that PWW knew or should have
known of the tortious interference on January 1, 1998. We believe this finding is supported by the
evidence. As previously discussed, Pritchett was concerned about the seismic testing and informed
the crew about the water well. When PWW drilled the well in December 1997, it produced potable
water without sand. However, when the pump was installed around the beginning of January 1998,
the well water contained excessive amounts of sand. Pritchett filed an affidavit earlier in the case
in which he stated that Russell Burke accused the seismograph survey of tearing up the well when
the pump was installed. At this point, a rational juror could have concluded PWW knew or should
have known that a third party had committed tortious acts. Further, the great weight and
preponderance of the evidence is not so contrary to the jury's conclusion that it indicates the result
is clearly wrong. PWW originally countersued UPRC on August 28, 2000, which was more than
two years from January 1, 1998. Therefore, the statute of limitations bars PWW's claim even if the
discovery rule applies.


 Because the statute of limitations is dispositive, we will not address UPRC's
remaining points of error.
PWW's Attorney's Fees
            PWW also contends it can recover attorney's fees because it prevailed against the Burkes on
the breach of contract claim. PWW did not request recovery at the trial court level for attorney's fees
based on breach of contract. No question solely concerning attorney's fees was submitted to the jury. 
The question that was submitted to the jury was clearly intended to be for the tortious interference
claim and combined both attorney's fees and the cost of the attempted repairs to the well. We deny
PWW's claim for attorney's fees.
Conclusion
            Both the Burkes' negligence claim and PWW's tortious interference with business relations
claim are barred by the statute of limitations. We render a take-nothing judgment concerning PWW's
tortious interference claim. The evidence is factually insufficient to support the Burkes' recovery of
$1.5 million for contract damages. Further, the trial court abused its discretion in not awarding a
settlement credit to UPRC in the amount of $111,500.00. If the Burkes, within fifteen days from the
date of our opinion, file a remittitur of $653,700.00 from the damages awarded by the trial court, we
will modify the trial court's judgment to award the Burkes a recovery of $842,300.00 in damages,
plus prejudgment interest of $358,552.84, and postjudgment interest at the rate of ten percent per
annum. If the Burkes fail to remit $653,700.00, the judgment will be reversed, and the cause
remanded for a new trial.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          March 31, 2004
Date Decided:             April 16, 2004



OPINION ON MOTION FOR REHEARING

            Both UPRC and PWW have filed motions for rehearing. PWW argues this Court erred in
holding that its suit was barred by the statute of limitations. UPRC argues this Court erred in not
considering whether there was sufficient evidence that the repair costs to the well were reasonable
and necessary and in awarding interest at a rate of ten percent. In its supplement to its motion for
rehearing, UPRC argues that this Court erred in allocating the costs among the parties and argues
for the first time on appeal that Russell and Lori Burke lack standing. We overrule the motions for
rehearing.
PWW's Motion for Rehearing
            PWW contends we erred in holding that its suit was barred by the statute of limitations. 
PWW argues that it was not until it was sued for breach of contract that it became aware of the
tortious interference with business relations. This argument fails because, even if the discovery rule
applies, the test is when PWW became aware of interference with its business relationship rather
than when the extent of the damages became known. The discovery rule exception defers accrual
of a cause of action until the plaintiff knew or should have known of the facts giving rise to the cause
of action. Trinity River Auth. v. URS Consultants, Inc., 889 S.W.2d 259, 262 (Tex. 1994); Dickson
Constr., Inc. v. Fid. & Deposit Co., 960 S.W.2d 845, 850 (Tex. App.—Texarkana 1997, no pet.). 
The tortious interference with business relations occurred when the well was damaged, not when the
Burkes filed suit. There is sufficient evidence to support the jury's determination that PWW knew
or should have known by January 1, 1998, that UPRC had damaged the well and thus interfered with
its contract. The fact that the extent of the damages caused by the interference did not become
apparent until it was sued by the Burkes does not toll the statute of limitations. 
            PWW also contends the effect of our ruling violates the open courts provision of the Texas
Constitution. See Tex. Const. art. I, § 13; Trinity River Auth., 889 S.W.2d at 261; Sax v. Votteler,
648 S.W.2d 661, 665 (Tex. 1983). In Trinity River Authority, the Texas Supreme Court held that
the statute of limitations did not violate the open courts provision. Trinity River Auth., 889 S.W.2d
at 261. In Sax, the Texas Supreme Court held that a limitations statute limiting a minor's opportunity
to file a malpractice suit violated the open courts provision because it effectively abolished the
minor's right to assert the cause of action. Sax, 648 S.W.2d at 667. Our situation is distinguishable
because PWW could have sued when it became aware that the well was damaged even though PWW
did not know the full extent of the damages at that time.
            PWW suggests that we 1) allow an equitable tolling exception, 2) apply the residual
limitations statute, or 3) apply the discovery rule. We analyzed the statute of limitations based on
the discovery rule. We also rejected the residual limitations statute based on the most recent Texas
Supreme Court analysis. See First Nat'l Bank of Eagle Pass v. Levine, 721 S.W.2d 287, 289 (Tex.
1986). PWW did not assert any equitable tolling exception at the trial court level.
            We overrule PWW's motion for rehearing.  
UPRC's Motion for Rehearing
            In its original motion for rehearing, UPRC argues that our opinion failed to address whether
the water well repair cost was reasonable and necessary. UPRC also contends the judgment interest
rate should be five percent rather than ten percent. 
            UPRC's first contention is that the Burkes failed to show that the cost of $7,800.00 to repair
the well was reasonable and necessary. A party seeking recovery for the costs of repairs must prove
they are reasonable. Fort Worth Hotel Ltd. P'ship v. Enserch Corp., 977 S.W.2d 746, 762 (Tex.
App.—Fort Worth 1998, no pet.). A party does not have to use the magic words "reasonable and
necessary," but need only present sufficient evidence to justify a jury's finding. Id. The Burkes
presented evidence that the well was pumping excessive amounts of sand, which made the water
unsuitable for the use intended. Evidence at trial indicated this problem was caused by a hole or
similar disruption in the screen. Jere Pritchett testified he made several attempts to repair the well,
but was unsuccessful. Although he did not charge the Burkes, Pritchett incurred costs of $10,000.00
in attempting to repair the well. Travis Russell was able to patch the well and charged the Burkes
$7,800.00 for the patch. The patch cost less than Pritchett's unsuccessful repairs and much less than
the original cost of the well. Based on this evidence, a rational juror could have concluded that the
repairs were reasonable and necessary, and such a conclusion is not against the great weight and
preponderance of the evidence.
            UPRC's second contention is that the judgment interest rate should be five percent rather than
ten percent. UPRC argues that the new version of Tex. Fin. Code Ann. § 304.003(c) applies
because this Court's opinion constitutes a judgment and the new provision applies to a judgment
which will be "signed or subject to appeal." See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2,
2003 Tex. Gen. Laws 2097. 
            During the last regular session, the Texas Legislature amended the postjudgment interest rate. 
See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096–97 (codified at
Tex. Fin. Code Ann. § 304.003(c) (Vernon Supp. 2004)). Section 304.003(c) of the Texas Finance
Code now provides:
(c)The postjudgment interest rate is:
(1) the prime rate as published by the Federal Reserve Bank of New
York on the date of computation;
(2) five percent a year if the prime rate as published by the Federal
Reserve Bank of New York described by Subdivision (1) is less than five
percent; or
(3) 15 percent a year if the prime rate as published by the Federal
Reserve Bank of New York described by Subdivision (1) is more than 15
percent.

Tex. Fin. Code Ann. § 304.003(c).
            The interpretation of a statute is a question of law. In re Canales, 52 S.W.3d 698, 701 (Tex.
2001) (orig. proceeding). The Fort Worth Court of Appeals has held that the amendments apply only
"where a judgment is signed on [or] after the effective date of the Act and to cases where a judgment
becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act." 
Columbia Med. Ctr. v. Bush, 122 S.W.3d 835, 865 (Tex. App.—Fort Worth 2003, pet. denied); see
Warrantech Corp. v. Computer Adapters Servs., No. 02-03-002-CV, 2004 Tex. App. LEXIS 3212
(Tex. App.—Fort Worth Apr. 8, 2004, no pet. h.); see also Utts v. Short, No. 03-03-00512-CV, 2004
Tex. App. LEXIS 2874 (Tex. App.—Austin Apr. 1, 2004, no pet. h.) (not designated for
publication). 
            We note that all of our sister courts' opinions affirmed the judgments of the trial courts and
that we reversed and rendered concerning PWW and suggested a remittitur concerning UPRC's
appeal. However, our sister courts' opinions indicate that "judgment" in the act refers to the trial
court judgment rather than a judgment by a court of appeals. In Columbia Medical Center, the Fort
Worth Court of Appeals held that "[t]he plain meaning of the phrase 'subject to an appeal' when used
to describe a judgment traditionally means that the judgment fully and finally disposes of all parties
and all issues before the trial court and therefore is capable of being appealed." Columbia Med. Ctr.,
122 S.W.3d at 865. We hold that the new version of Section 304.003(c) applies to a case in which
a final judgment is signed in the trial court or subject to appeal from the trial court on or after June
20, 2003. Since the judgment was signed by the trial court and appeal was taken well before the
effective date of the new version of Section 304.003(c), it does not apply.
            The trial court signed the final judgment in this case January 10, 2003. This judgment
contained a prejudgment and postjudgment interest rate of ten percent. At the time the judgment was
signed in the trial court, Section 304.003(c) provided:
(c)The postjudgment interest rate is:
(1) the auction rate quoted on a discount basis for 52-week treasury
bills issued by the United States government as most recently published by
the Federal Reserve Board before the date of computation;
(2) 10 percent a year if the auction rate described by Subdivision (1)
is less than 10 percent; or
(3) 20 percent a year if the auction rate described by Subdivision (1)
is more than 20 percent.
Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 222, 232 (amended
2003) (current version at Tex. Fin. Code Ann. § 304.003(c)). Thus, the applicable interest rate was
ten percent. We overrule UPRC's motion for rehearing.
UPRC's Supplement to Motion for Rehearing
            In its supplement to its motion for rehearing, UPRC alleges two more errors in this Court's
opinion. UPRC contends that we erred in allocating the costs among the parties and that the Burkes
lack standing to pursue the appeal.
            The first alleged error argued by UPRC is that this Court erred in allocating the costs of the
appeal among the parties. This Court ordered UPRC to pay one half of the costs, the Burkes to pay
one third of the costs; and for PWW to pay one sixth of the costs. UPRC argues that we should have
applied Rule 139 of the Texas Rules of Civil Procedure and ordered that the Burkes and PWW pay
the costs. UPRC argues that, since Rule 139 is more specific than Rule 43.4 of the Rules of
Appellate Procedure, it should govern the award of the costs. See Tex. R. Civ. P. 139; Tex. R. App.
P. 43.4.
            Rule 43.4 provides that a court of appeals should award costs to the prevailing party. Tex.
R. App. P. 43.4. We followed the prevailing party rule in allocating costs. However, no party
prevailed on all of the principal issues. Given that there were multiple appeals and multiple parties
prevailing, we allocated the costs accordingly.
            The general rule is that the specific rule will control over the general rule. See Tex. Gov't
Code Ann. § 311.026 (Vernon 1998). However, we cannot say that Rule 139 is more specific than
Rule 43.4. Both rules are comprehensive on their face. See Tex. R. Civ. P. 139; Tex. R. App. P. 43.4 
If the rules were irreconcilable, Rule 43.4 would govern as the more recent rule. See Tex. Gov't
Code Ann. § 311.025 (Vernon 1998). However, we believe the rules can be harmonized. When
presented with a potential conflict among different rules, the rules should be construed, if possible,
to give effect to both. 
            The rules can be harmonized because the court may award costs to the prevailing party,
otherwise as required by law, or otherwise for good cause. Rule 43.4 provides that the court "may
tax costs otherwise as required by law or for good cause." Tex. R. App. P. 43.4. The word "may"
indicates that such an action is at the discretion of the court. See Tex. Gov't Code Ann. § 311.016
(Vernon 1998). We conclude Rule 139 falls within the meaning of "otherwise required by law" and
could be followed at the court's discretion. However, the court may award costs other than to the
prevailing party based on "good cause." See Burns v. Bishop, 48 S.W.3d 459, 468 (Tex.
App.—Houston [14th Dist.] 2001, no pet.); Keene Corp. v. Gardner, 837 S.W.2d 224, 232 (Tex.
App.—Dallas 1992, writ denied); see also Lesikar v. Rappeport, 809 S.W.2d 246, 253 (Tex.
App.—Texarkana 1991, no writ) (op. on reh'g). Courts of appeals have considerable discretion in
taxing costs on appeal. Save Our Springs Legal Def. Fund v. City of Austin, 874 S.W.2d 109,
110–11 (Tex. App.—Austin 1994, no writ). When both parties prevail on some issues but not
others, courts have apportioned the costs of appeal between the parties. See, e.g., City of Austin v.
Capitol Livestock Auction Co., 453 S.W.2d 461, 465 (Tex. 1970).
            Our distribution of the costs was based on which party prevailed on each portion of the
appeal and the magnitude of that portion of the appeal. Because this case involved multiple appeals
of different magnitudes, we assessed the costs accordingly. The most substantial appeal was brought
by UPRC against the Burkes. UPRC did not prevail on the principal issues and thus we assessed one
half the costs of the appeal against UPRC. While monetarily significant, the Burkes' appeal against
UPRC involved a less substantial substantive portion of the appeal. Since the Burkes did not prevail
on their appeal, we assessed one third of the costs against them. Although UPRC prevailed on the
portion of their appeal against PWW, this part of the appeal was intertwined with the appeal
concerning the Burkes. As the least substantial portion of the appeal, we ordered PWW to pay one
sixth of the costs of appeal. 
            The second contention of UPRC is that the Burkes lack standing due to their filing a
bankruptcy action. UPRC argues the trial court erred in failing to dismiss the Burkes' suit. Standing
is a component of subject matter jurisdiction; it cannot be waived and may be raised at any point. 
Anderson v. New Prop. Owners' Ass'n, 122 S.W.3d 378, 384 (Tex. App.—Texarkana 2003, pet.
denied). 
            Once a bankruptcy petition is filed, the estate takes ownership of all the debtor's property,
including his or her causes of action. 11 U.S.C.A. § 541(a) (West 1993); Douglas v. Delp, 987
S.W.2d 879, 883 (Tex. 1999); Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 143 (Tex.
App.—Texarkana 2000, no pet.); Carter v. Carter, 21 S.W.3d 441, 443 (Tex. App.—San Antonio
2000, no pet.). However, "where an action is pending prior to the commencement of a bankruptcy
proceeding a trustee has three options: (1) to assume prosecution of the pending action; (2) to
consent to the debtor's continued prosecution of the action for the trustee's benefit; or (3) to decline
to prosecute the pending actions if it appears the prosecution would be fruitless." Carter, 21 S.W.3d
at 443.
            This suit was pending at the time the Burkes declared bankruptcy. On January 12, 2000, the
Burkes joined UPRC to the pending suit against PWW. On December 14, 2000, the Burkes filed
for bankruptcy. Thereafter, the bankruptcy trustee joined this suit with the Burkes. In taking this
action, it appears the bankruptcy trustee chose two of the possible options. He both assumed
prosecution and consented to the debtor's continued prosecution for the trustee's benefit. The
Fourteenth District Court of Appeals has suggested that, if a bankruptcy trustee has notice of a
pending suit and does not intervene, he is deemed to have consented to the prosecution. Sommers
v. Concepcion, 20 S.W.3d 27, 38–39 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (suit by
a trustee is barred due to res judicata when he had notice of the debtor's prior prosecution). As a
party, the trustee clearly had notice that the Burkes were continuing to prosecute the case. Therefore,
we find the trustee consented to the prosecution and the Burkes have standing. Any recovery will
inure to the trustee's benefit for the bankruptcy estate. We overrule UPRC's supplement to their
motion for rehearing.
            For the reasons stated, we overrule the motions for rehearing by PWW and UPRC. In
accordance with the suggestion of a remittitur, the Burkes have filed a remittitur of $653,700.00. 
We modify the judgment of the trial court and, as modified, we affirm the Burkes' recovery of
$842,300.00, plus prejudgment interest of $358,552.84 and postjudgment interest at the rate of ten
percent per annum.
 


                                                                        Jack Carter
                                                                        Justice
 
Date:               June 9, 2004